**SAN FRANCISCO SEALS, LTD., a Limited Partnership, Plaintiff,**

v.

**NATIONAL HOCKEY LEAGUE et al.,
Defendants.**

No. 72–818–JWC.

United States District Court,
C. D. California.

July 18, 1974.

Gary W. Hoecker, Maxwell M. Blecher, Harold R. Collins, Jr., and Joel R. Bennett of Blecher, Collins & Hoecker, Los Angeles, Cal., for plaintiff.

Edward M. Medvene, Richard M. Mosk, Arthur Groman, Michael Holtzman, and Roy L. Shults of Mitchell, Silberberg & Knupp, Los Angeles, Cal., for defendants.

## OPINION

CURTIS, District Judge.

The plaintiff, San Francisco Seals, Ltd., is a professional hockey team affiliated with the National Hockey League. It brings this private anti-trust action against the National Hockey League and all other member clubs claiming that it has been unlawfully prevented from moving its franchise from San Francisco to Vancouver, B. C., which, plaintiff charges, constitutes a violation of both sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). The plaintiff has filed a motion for a partial summary judgment, while the defendants seek a summary judgment disposing of all issues.

### UNCONTROVERTED FACTS

The National Hockey League was established in 1917 with six member clubs, and over the years has expanded until at present it has some fourteen members. It is managed by a Board of Governors, composed of one representative from each member club. Its principal purposes as set forth in the constitution are as follows:

"(a) To perpetuate hockey as one of the National games of the United States and Canada.

(b) The promotion of the common interests of the members of the League, each member being the owner of a professional hockey club located in the United States or Canada.

(c) The promulgation of rules governing the conduct of play of hockey games between the member clubs in the League, the relationships between players and member clubs, between member clubs and the League and between the member clubs and other hockey clubs, to the end that the public may be assured of a high standard of skill and fair play, integrity and good sportsmanship.

(d) The arbitration and settlement of disputes between the member clubs and between member clubs and players.

(e) The education of the public, through advertising, radio and other media, to the end that professional hockey, as played according to the standards of the League, may gain popular support and acceptance as a wholesome entertainment.

(f) The development of youth in mind and body and the teaching of fair play and good sportsmanship through the media of hockey."

Each member owns and operates a professional ice hockey team franchised to play under the auspices of the National Hockey League with a designated home base. In this respect Section 4.-1(c) of the constitution provides:

" 'Home Territory', with respect to any member, means: Each Member Club shall have exclusive territorial rights in the city in which it is located and within fifty miles of that city's corporate limits."

Section 4.2 provides:

"*Territorial Rights of League.* The League shall have exclusive control of the playing of hockey games by member clubs in the home territory of each member, subject to the rights hereinafter granted to members. The members shall have the right to and agree to operate professional hockey

clubs and play the League schedule in their respective cities or boroughs as indicated opposite their signatures hereto. No member shall transfer its club and franchise to a different city or borough. No additional cities or boroughs shall be added to the League circuit without the consent of three-fourths of all the members of the League. Any admission of new members with franchises to operate in any additional cities or boroughs shall be subject to the provisions of Section 4.-3."

Section 4.3 provides:

"*Territorial Rights of Members.* Each member shall have exclusive control of the playing of hockey games within its home territory including, but not being limited to, the playing in such home territory of hockey games by any teams owned or controlled by such member or by other members of the League. . . ."

On February 18, 1969, plaintiff made a formal application to exchange its San Francisco/Oakland franchise for one in Vancouver, B. C., to be issued to a new corporate entity in which the plaintiffs were to have an interest. The Board of Governors' denial of this request brought about the institution of this action.

## ISSUES

Plaintiff contends at the outset that major league professional hockey is subject to federal anti-trust laws. It seem to me reasonably clear that this is so and I so hold. Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462 (E.D.Pa.1972).

This leaves, therefore, two principal issues. Do the constitution and bylaws of the National Hockey League and the action of its Board of Governors, pursuant thereto, violate section 1 of the Sherman Act? And does plaintiff have standing to sue for a section 2 violation?

## PLAINTIFF'S CONTENTIONS

Before discussing the anti-trust aspects of this case it becomes important to clarify plaintiff's precise position. Although plaintiff claims to attack the general territorial scheme of the league, it apparently has no quarrel with that scheme insofar as it allocates to each team a "home territory" with certain exclusive rights within its limits. In fact, it is these exclusive rights that the plaintiff seeks to obtain for itself in an area of its own choosing.

The real thrust of plaintiff's complaint is that it is prohibited from transferring its franchise to Vancouver with all attendant territorial benefits and other league privileges. As previously pointed out "transfer" may not be a correct characterization of the transaction. An application for a new franchise at the new location may be a more accurate description of what has taken place. If so, plaintiff contends the refusal of the Board of Governors to grant such a franchise is a violation of section 1 of the Sherman Act.[1]

## NO SHOWING OF SECTION 1 VIOLATION

In applying either section 1 or section 2, inquiry must first be made as to the relevant market, and the court must determine whether the trade or commerce within that market is affected by the alleged restraints. American Aloe Corp. v. Aloe Creme Laboratories, Inc., 420 F. 2d 1248, 1256 (7th Cir. 1970); Mercantile National Bank of Chicago v. Quest, Inc., 303 F.Supp. 926, 934 (N.D.Ind. 1969).

In the leading case discussing relevant product market, United States v. E. I. du Pont de Nemours & Co., 351 U.S.

1. Section 1 provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . . ."

377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956), the Supreme Court said:

"The varying circumstances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." (Footnote omitted.)

In Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), the Court noted:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593–595 [77 S.Ct. 872, 1 L.Ed.2d 1057]. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." (Footnotes omitted.)

With these standards in mind let us examine the uncontroverted facts before us. The plaintiff is the owner of a professional hockey team, which team is in the business of producing sporting events for profit. The main thrust of this endeavor is the playing of hockey games before live audiences. In doing so, plaintiff would normally compete with other professional hockey teams similarly organized and pursuing the same purposes. Plaintiff complains that the defendants have combined to prevent it from playing in Vancouver, B. C.

where it believes that the live gate revenue possibilities are greater, and that the defendants' actions in doing so constitute a restraint of trade and commerce.

■ What then is the relevant market? I find that the relevant product market with which we are here concerned is the production of professional hockey games before live audiences, and that the relevant geographical market is the United States and Canada.

Now let us examine plaintiff's relationship with the defendants within the relevant market. Plaintiff, of course, wishes to participate in this market, but not in competition with the defendants. It expects to maintain its league membership and to accept and enjoy all of the exclusive territorial benefits which the National Hockey League affords. As a member team, it will continue cooperating with the defendants in pursuit of its main purpose, i. e:, producing sporting events of uniformly high quality appropriately scheduled as to both time and location so as to assure all members of the league the best financial return. In this respect, the plaintiff and defendants are acting together as one single business enterprise, competing against other similarly organized professional leagues.

■■ The main thrust of the Sherman Act is to prohibit some competitors from combining with other competitors to gain a competitive advantage over other competitors by creating impermissible restraints upon trade or commerce. It is fundamental in a section 1 violation that there must be at least two independent business entities accused of combining or conspiring to restrain trade. Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 365 F.2d 478, 484 (5th Cir. 1966); Stewart v. Hevelone, 283 F.Supp. 842, 845 (D.Neb.1968).

■ Within the relevant market in which we are here concerned, plaintiff and defendants are not competitors in the economic sense. It is of course true

that the member teams compete among themselves athletically for championship honors, and they may even compete economically, to a greater or lesser degree, in some other market not relevant to our present inquiry. But, they are not competitors in the economic sense in this relevant market. They are, in fact, all members of a single unit competing as such with other similar professional leagues. Consequently, the organizational scheme of the National Hockey League, by which all its members are bound, imposes no restraint upon trade or commerce in this relevant market, but rather makes possible a segment of commercial activity which could hardly exist without it.

In support of its position, plaintiff has relied upon the recent case of United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), a classic example of a horizontal allocation of exclusive territories as a *per se* section 1 violation. This was an injunction action brought by the United States against Topco, a cooperative association composed of about twenty-five small and medium-sized independent regional supermarket chains. Its bylaws established exclusive territorial licenses for its members and also prohibited its members from selling Topco products outside of certain specified areas. The membership was restricted and could be enlarged only by a vote of seventy-five percent of the association's members. The Court in finding a *per se* violation said:

"One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action, is usually termed a 'horizontal' restraint, in contradistinction to combinations of persons at different levels of the market structure, e. g., manufacturers and distributors, which are termed 'vertical' restraints. This Court has reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.' White Motor Co. v. United States, 372 U.S. 253, 263 [83 S.Ct. 696, 702, 9 L.Ed.2d 738] (1963)." 405 U.S. at 608, 92 S.Ct. at 1133.

But *Topco* and the long line of cases cited therein are not applicable here for they all deal with combinations of independent business enterprises competing economically with each other and with other businesses not included in the combination. Since the purpose of this scheme is to give a competitive advantage to some market chains over others, it has a direct effect upon trade or commerce within the market. In the case before us the parties are not economic competitors, and the territorial restraints of which the plaintiff complains have no effect upon trade or commerce in this relevant market.

Plaintiff relies upon Blalock v. Ladies Professional Golf Association, 359 F. Supp. 1260 (N.D.Ga.1973), as a case in point. Here the defendants were female professional golfers who were members of the Executive Board of the Ladies Professional Golf Association. As such they suspended another female professional golfer for a period of one year for cheating. The court pointed out that the plaintiff and the defendants were all individual competitors for prize money and that the suspension amounted to excluding the plaintiff from the market, since although suspended, she was still a member in good standing with the Ladies Professional Golf Association, and as such could not compete elsewhere. The court held that the defendants were acting completely within their unfettered subjective discretion and that each stood to gain financially by their actions. Under these circumstances the court held this to be a naked restraint of trade and hence a *per se* violation of section 1.

In *Blalock*, the plaintiff and defendants were actual competitors in the economic sense, in what the court referred to in *Brown Shoe Co., supra,* as a "sub-

market." Within this market the actions of the defendants had a direct effect upon competition within it, and the court quite properly held it to be a section 1 violation. Consequently, *Blalock* is clearly distinguishable, and for that reason is not persuasive.

■ I conclude, therefore, that as a matter of law and on the basis of the uncontroverted evidence before me, the actions of the Board of Governors pursuant to the constitution and bylaws of the National Hockey League do not violate section 1 of the Sherman Act, as they do not restrain trade or commerce within the relevant market.

## PLAINTIFF DOES NOT HAVE STANDING TO SUE FOR SECTION 2 VIOLATION

In claiming a section 2 violation of the Sherman Act, plaintiff charged the defendants with attempting to monopolize the business of major league hockey. It is urged that in order to dominate the market, the defendants have sought to keep out rival leagues by franchising more teams and locating them in areas where rival leagues might possibly succeed. Plaintiff urges that its request for an exchange was denied in order to keep it in San Francisco, thus discouraging the formation and growth of teams from rival leagues in that location.[2]

Section 4 of the Clayton Act (15 U.S.C. § 15) under which this action is brought, reads:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . ."

In interpreting this section, the "courts have impressed a standing doctrine so as to confine the availability of section 4 relief only to those individuals whose protection is the fundamental purpose of the antitrust laws." In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 125 (9th Cir. 1973).

■ First, a plaintiff must allege injury to his "business or property." Secondly, he must allege that his injury was occasioned "by reason of" an anti-trust violation. *Multidistrict Vehicle, supra,* 481 F.2d at 126.

In *Vehicle*, certain governmental entities and crop farmers sued the Automobile Manufacturers Association, Inc. and American Motors Corporation, alleging that the defendants were conspiring to eliminate competition among themselves in the research, development, manufacture, installation and patenting of automotive air pollution control devices. In applying these two tests on the issue of standing under section 4 of the Clayton Act, the court held that the governmental entities did not have standing since they failed to allege injury to their property or business. But it found that the farmers had passed the first hurdle since they could lose crops through air pollution. 481 F.2d at 126. In applying the second test, as to whether the farmers' commercial interests were injured "by reason of" any violation of the anti-trust laws, the court utilized the "target area" approach.

> "[C]ourts employing the 'target area' approach focus on claimant's relationship to the area of the economy allegedly injured by the defendant.
>
>> '[T]o state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of

2. Section 2 of the Sherman Act (Title 15 U.S.C. § 2) provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with

foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured "by reason" of anything forbidden in the antitrust laws.'

Conference of Studio Unions v. Loew's Inc., 193 F.2d 51, 54–55 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952)." 481 F.2d at 127–128.

The court held that under this "target area" test the crop farmers did not have standing to sue since the area of the economy endangered (research, development, etc., of air pollution control devices) was not one in which the farmers had any commercial interest. 481 F.2d at 129–130.

In the instant case, the area of the economy endangered by the defendants' alleged conspiracy to monopolize is that in which rival pro hockey leagues compete. The target of the defendants' alleged conspiracy is any rival league which might try to take over part of the National Hockey League's market. Plaintiff is not a rival hockey league, and the defendants' alleged actions to prevent the formation of rival leagues were not aimed at it. Actually, plaintiff does not claim to have been injured by the monopolistic practices of the National Hockey League as such, but that the monopolistic protection which affiliation with the National Hockey League can afford is being denied it at Vancouver.

■ As the Court said in Affiliated Music Enterprises, Inc. v. Sesac, Inc., 160 F.Supp. 865, 876 (S.D.N.Y.1958), aff'd, 268 F.2d 13 (2d Cir. 1959), cert. denied, 361 U.S. 831, 80 S.Ct. 82, 4 L.Ed.2d 74 (1959), plaintiff "was not aimed at and it was not hit; it was not even in the target area." Accordingly, plaintiff does not have standing to bring this action.

For the above mentioned reasons, the defendants' motion for summary judgment is granted, and the plaintiff's motion for partial summary judgment is denied.

Defendants' attorneys are ordered to prepare appropriate findings of fact, conclusions of law, and judgment.