**NORTH AMERICAN SOCCER LEAGUE et al., Plaintiffs,**

v.

**NATIONAL FOOTBALL LEAGUE et al., Defendants.**

**No. 78 Civ. 4560–CSH.**

United States District Court, S. D. New York.

Feb. 21, 1979.

Weil, Gotshal & Manges, by Ira M. Millstein, James W. Quinn, Kenneth Lemberger, Jeffrey L. Kessler, New York City, for plaintiffs.

Sullivan & Cromwell, by William E. Willis, James H. Carter, Howard D. Burnett, New York City, for defendants.

## MEMORANDUM OPINION

HAIGHT, District Judge:

This is an antitrust case brought by the North American Soccer League ("NASL") and 21 of its member clubs against the National Football League ("NFL") and 25 of its member clubs to test the legality under the Sherman Act, 15 U.S.C. § 1 *et seq.*, of a proposed amendment to the NFL's constitution and by-laws implementing a "cross-ownership ban." The amendment, if enacted, would prevent the owner of a majority interest in an NFL club, or a member of his family, from acquiring any interest in another major team sport. To the extent that such cross-ownership presently exists, the amendment mandates divestiture, and imposes fines and other sanctions for non-compliance within the time specified. Plaintiffs assert their complaint under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 2201. They claim injunctive and declaratory relief, and treble money damages. Jurisdiction is posited upon 28 U.S.C. §§ 1331 and 1337, and venue asserted under 28 U.S.C. § 1391 and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22. Plaintiffs now move pursuant to Rule 65, F.R.Civ.P. and Section

16 of the Clayton Act, 15 U.S.C. § 26, for a preliminary injunction restraining enactment of the amendment. Because plaintiffs have made the requisite showing for such relief, the injunction will issue.

## I.

■ Preliminarily, we note that a number of the defendant NFL clubs have by their answers contested the Court's jurisdiction over their persons. Whatever the merits of those assertions—and the jurisdictional issue is not pressed on this motion—it is clear that a preliminary injunction, if otherwise appropriate, would not be inhibited. The NFL does not contest *in personam* jurisdiction. Rule 65 provides that an injunction is binding:

" . . . upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

All member clubs of the NFL are by definition "in active concert or participation with" the League they formed to conduct their joint affairs. There is, in short, the requisite showing of privity. *Golden State Bottling Co. v. National Labor Relations Board,* 414 U.S. 168, 179–180, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Hart v. Community School Board of Brooklyn, N. Y. School District No. 21,* 383 F.Supp. 699, 753 (E.D.N.Y.1974), *appeal dismissed,* 497 F.2d 1027 (2d Cir. 1974); 7 *Moore's Federal Practice* ¶ 65.-13 (2d ed. 1978). No difficulty in notifying the NFL member clubs of the Court's order need be anticipated.

## II.

■ Plaintiffs move for a preliminary injunction, prohibitory in nature, to prevent the NFL and its member clubs from enacting a particular amendment to the NFL constitution and by-laws. The record on the motion consists of the pleadings, affidavits and exhibits. Two oral arguments have been heard, the first shortly after service of the motion and the second after filing of extensive and able briefs. While discovery is proceeding on the merits, both plaintiffs and defendants stated that an evidentiary hearing need not precede resolution of the present motion. In these circumstances no evidentiary hearing is required. *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438, 442 (2d Cir. 1977).

■ The showing a plaintiff must make to obtain a preliminary injunction has been the subject of a number of recent Second Circuit decisions, not all of them entirely reconcilable. For a time *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973) appeared to declare a two-pronged test as the rule of the Circuit:

"The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." (emphasis in original).

The *Sonesta* formulation was repeated in numerous subsequent cases. However, in *Triebwasser & Katz v. A. T. & T. Co.,* 535 F.2d 1356, 1359 (2d Cir. 1976), the Court stressed that irreparable injury was required under both prongs of the *Sonesta* test:

"[T]his language of the second prong of the *Sonesta* test does not eliminate the basic obligation of the plaintiff to make a clear showing of the threat of irreparable harm. That is a fundamental and traditional requirement of all preliminary injunctive relief, since equity cannot intervene where there is an adequate remedy at law. If the element of irreparable damage is prerequisite for relief where the plaintiff must show probable success on the merits, then *a fortiori* where the plaintiff establishes something less than probable success as to the merits, need for proof of the threat of irreparable damage is more pronounced. In sum, the balancing of hardships test of *Sonesta*

necessarily includes the showing of irreparable harm." (emphasis in original) (citations omitted).

Some commentators regarded *Triebwasser* as a major revision of the *Sonesta* test, in that *Triebwasser* required a showing of irreparable harm in the second prong where none had been required before. Other commentators argued that irreparable harm had in the past been part of the second prong's proof of "balance of hardships," a view endorsed shortly after *Triebwasser* by at least one member of the Second Circuit. Mulligan, *Preliminary Injunction in the Second Circuit,* 43 Bklyn.L.Rev. 831, 832 (1977); to the extent that *Sonesta* indicated "that irreparable harm is not necessary for every preliminary injunction," Judge Mulligan disagreed with it. *Id.* at 839. In *New York Association of Homes for Aging v. Toia,* 559 F.2d 876, 880 (2d Cir. 1977), the Court said that under either *Sonesta* test "the movant must show a threat of irreparable harm"; a comparable holding in *New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 755 (2d Cir. 1977) was embellished by the requirement that "the alleged threats of irreparable harm are not remote or speculative but are actual and imminent." A trace of confusion creeps back in, however, in the Court's recent citation of *Sonesta* for the proposition that the "moving party must make a showing of *possible* irreparable harm," *Selchow & Righter Co. v. McGraw-Hill Book Co.,* 580 F.2d 25, 27 (2d Cir. 1978). *Cf. Caulfield v. Board of Education,* 583 F.2d 605 (2d Cir. 1978), where the Court announced the standard as "*possible* irreparable injury" but found that the District Court "could not conclude that the appellants were *likely* to suffer irreparable injury." (emphasis added).

Since the case at bar falls within the antitrust statutes, we must also conjure with 15 U.S.C. § 26, which authorizes a preliminary injunction under general principles of equity "and a showing that the danger of irreparable loss or damage is immediate . . . ." In *Triebwasser, supra,* the Second Circuit, after characterizing the showing of irreparable harm as necessary under either *Sonesta* test, went on to observe:

"In antitrust cases, the proposition requires no further elucidation since 15 U.S.C. § 26 explicitly requires for a preliminary injunction a showing 'that the danger of irreparable loss or damage is immediate,' and we have so held in a recent private antitrust case, *SCM Corp. v. Xerox Corp.,* 507 F.2d 358, 360 (2d Cir. 1974)."

In *SCM Corp. v. Xerox Corp.,* cited by the Second Circuit in *Triebwasser,* the Court characterized the Clayton Act's requirements as "merely declarative of ordinary equitable principles." 507 F.2d at 360. Thus the degree to which the Second Circuit regards the statute's requirement of *immediacy* as a separate element is somewhat obscure. *Jacobson, supra,* also an antitrust case, reiterates the *Sonesta* formulae, 548 F.2d at 441 n. 2, but says nothing about the requirements of § 26. *Jacobson* does make clear that, as to the merits, within the antitrust context:

". . . the second branch of the *Sonesta* test requires no more than a showing of 'sufficiently serious questions going to the merits to make them a fair ground for litigation.' 483 F.2d at 250."

The formula I distill from these authorities is that the plaintiffs in this antitrust action are entitled to a preliminary injunction if they bring themselves within either of the two branches of *Sonesta* ; and, in so doing, demonstrate a substantial threat of immediate irreparable harm.

I hold that plaintiffs have made the requisite showings.

## III.

### A. *The Threat of Irreparable Harm to the NASL and Its Members.*

██ I conclude that the NASL and its plaintiff clubs have made a sufficient showing of a threat of irreparable harm, should the NFL proceed to enact the proposed amendment or otherwise attempt to enforce the cross-ownership ban, to satisfy that requirement of the applicable standards. To

appreciate the nature and immediacy of the harm, some background discussion is necessary.[1]

The NASL is a relative newcomer to the ranks of professional team sport leagues in America, having been established in 1968. On the basis of the undisputed factual recitations in NASL Commissioner Woosnam's affidavit, I find that the ten year history of the NASL has been one of struggle for financial security, franchise stability, and public recognition. Although the 1978 soccer season was the most successful in NASL history, only one of the 28 NASL franchises is expected to show a profit for that year; the remaining teams suffered operating losses, which in one instance ran as high as $1.5 million. However, for the first time in some ten years, the NASL has negotiated major television network coverage for its 1979 season. Commissioner Woosnam asserts that such television coverage is vital to the NASL in two respects: first, network television exposure generates fan interest which leads to increased attendance at games and increased gate receipts; second, a network contract provides direct revenues for the financially pressed NASL clubs. The Commissioner points out that for the NASL to retain and expand such television coverage, the major networks must be convinced "that the NASL is a stable and successful league" [2] with a bright economic future.

An important element of stability for the NASL has been furnished by individuals or families who own member soccer clubs, and also own NFL football clubs. Perhaps the foremost among these "cross-owners" is Lamar Hunt of Dallas, Texas, a sporting world legend in his own time. Hunt, as owner of the Kansas City Chiefs football team, was in the early 1960's one of the founders of the American Football League,

subsequently merged with the NFL. Hunt is now chairman and sole owner of the NFL Kansas City franchise. Hunt also is a part owner of the Chicago Bulls of the National Basketball Association, and the founder of the World Championship Tennis circuit. In 1967 Hunt purchased a Dallas soccer franchise which, in 1968, became the NASL's Dallas club, called the Dallas Tornado. Woosnam's affidavit pays eloquent and, in my judgment convincing, tribute to the past and continuing importance to the struggling NASL of Hunt's presence and participation.[3]

In addition to Mr. Hunt, the present NASL and NFL cross-owners include two well-known sports families whose participation in the NASL has contributed in some measure to its stability. The Robbie family is a case in point. Elizabeth Robbie is the owner and managing general partner of the NASL's Fort Lauderdale Strikers franchise; her husband, Joe Robbie, is the managing general partner and principal owner of the NFL's Miami Dolphins franchise; their son, Tim, serves as the Strikers' public relations director. Mrs. Robbie's NASL involvement has increased from that of a limited partner in 1973 to managing general partner in 1976, a position she assumed "to preserve her investment when all of the remaining general partners resigned from the partnership." [4] The Robbies have thus provided an NASL club with crucial capital and sports entrepreneurial skill, and, according to Commissioner Woosnam, have "dramatically turned around the prospects for the NASL's Fort Lauderdale franchise." [5]

Another cross-owning family is the Nordstroms of Seattle. They present a unique situation in that family members had a prior NASL investment when, in 1975, an entity owned by the Nordstrom Family

---

1. It is perhaps more common to discuss merits questions first and then consider the elements of irreparable harm. I reverse that order here because certain historical and economic factors, useful to an understanding of the case as a whole, fit more naturally within this topic.

2. Affidavit of Philip A. Woosnam, NASL Commissioner, September 27, 1978, at p. 10, ¶ 17.

3. *Id.* at pp. 6–7, ¶¶ 9–11.

4. Affidavit of Joe Robbie, October 27, 1978, at p. 1, ¶ 1.

5. Woosnam affidavit at p. 11, ¶ 19.

Partnership was awarded the new NFL Seattle franchise. Commissioner Woosnam asserts, and the NFL does not seriously dispute, that the Nordstroms' soccer success "paved the way for their entry into the NFL." [6]

A fourth instance of NASL/NFL cross-ownership is presented by William Bidwell, an owner of the NFL St. Louis Cardinals and the holder of a 3 percent interest in the NASL California Surf.[7]

We now consider the effect of the NFL's proposed amendment upon this presently existing cross-ownership. The amendment was prefaced by a series of four resolutions enacted by the NFL in 1967, 1972, 1973 and 1976, the texts of which are reproduced in the margin.[8] While these resolutions condemned in principle certain species of cross-ownership, no effort was made to enforce divestiture of such cross-ownership as existed. The 1967, 1972 and 1973 resolutions said nothing about divestiture. The 1976 resolution contented itself was calling upon those NFL owners holding an interest in another major team sport to "use best effort[s] to dispose of current holdings." No sanctions were imposed for failure to do so, and it does not appear that any divestitures in fact occurred. While the 1967 resolution "instructed" counsel for the league to draft "appropriate amendments to the Constitution and By-Laws," the record does not reveal any action in response to those instructions.

Now an amendment to the by-laws is proposed. Its provisions form the subject matter of this action. The amendment is also reproduced in the margin.[9] Its terms

---

6. *Ibid.*

7. Affidavit of Pete Rozelle, NFL Commissioner, October 13, 1978, at p. 18, ¶ 30.

8. *"NFL Resolutions Concerning Cross-Ownership*

Resolution adopted January 16, 1967:
"RESOLVED that the National Football League does reaffirm its traditional position that no person having operating control of a franchise in the National Football League may acquire or possess control, directly or indirectly, of any other team sports enterprise or business, and that league counsel is instructed to draft appropriate amendments to the Constitution and By-Laws and necessary related resolutions defining the word 'control' for the purpose of this resolution."
Resolution adopted May 25, 1972:
"RESOLVED, that no person owning a majority interest in or in direct or indirect operational control of a member club may acquire any interest in another major team sport. Additionally, any person holding such financial interest at the time this Resolution is adopted will in no case increase his percentage of such interest in another major team sport. The adoption of the foregoing Resolution shall not affect or modify the provisions of Article III, Section 3.5 of the Constitution and By-Laws."
Resolution adopted June 26, 1973:
"RESOLVED, that no person owning a majority interest in or in direct or indirect operational control of a member club may acquire any interest in another major team sport. Additionally, any person holding such financial interest at the time this Resolution is adopted will in no case increase his percentage of such interest in another major team sport. The adoption of the foregoing Resolution shall not

affect nor modify the provisions of Article III, Section 3.5 of the Constitution and By-Laws." Resolution adopted June 16, 1976:

"RESOLVED, That no person owning a majority interest in or in direct or indirect operational control of a member club may acquire any interest in another major team sport. Additionally, any person holding such financial interest at the time this resolution is adopted will in no case increase his percentage of such interest in another major team sport and will use best effort to dispose of current holdings. Major team sport, for purposes of this resolution, is defined as major league basketball, hockey, baseball and soccer. The adoption of the foregoing resolution shall not affect nor modify the provisions of Article III, Section 3.5 of the NFL Constitution and By-Laws." Affidavit of Donald Weiss, NFL Executive Director, September 29, 1978, at Exhibit A.

9. The proposed amendment reads as follows:
"Amend Article IX, by adding a new Section 9.4 as follows:

"9.4(A) No person (1) owning a majority interest in a member club, or (2) directly or indirectly having substantial operational control, or substantial influence over the operations, of a member club, or (3) serving as an officer or director of a member club, nor (4) any spouse or minor child of any such person, may directly or indirectly acquire, retain, or possess any interest in another major team sport (including major league baseball, basketball, hockey and soccer).

"(B) The prohibition set forth in subsection (A) hereof shall also apply to relatives of such persons (including siblings, parents, adult children, adult and minor grandchil-

would expand the scope of the June 16, 1976 resolution currently in effect in three important respects. Similar to the 1976 resolution, it would prohibit an NFL "control person" from *acquiring* any interest in a competing major league team sport, defined to include baseball, basketball, hockey and soccer. The amendment, however, would significantly expand the class of persons subject to the prohibition. With respect to the *retention* of a present cross-ownership interest, the amendment would replace the resolution's "best effort to dispose" requirement with a flat prohibition. Finally, the amendment would set a definite date—February 1, 1980—for divestiture of cross-ownership holdings, and would authorize substantial financial penalties and ultimately, ouster from the NFL, for violation of the cross-ownership ban after that date.

If the amendment takes effect, all four of the present cross-ownership situations discussed *supra* would be affected. That is because the amendment, going beyond the bounds of the resolution, embraces family members of NFL club owners; thus the soccer interests of Mrs. Robbie and the Nordstrom family would be condemned. In consequence, passage of the amendment

would require Hunt, the Robbies, Bidwell, and arguably the Nordstroms,[10] to divest themselves of their interests in their NASL clubs. Bidwell's soccer interest is minor, but Hunt and Mrs. Robbie control the Dallas and Miami soccer clubs, and the Nordstroms' interests in the Seattle club are substantial.

To meet a divestiture deadline of February 1, 1980, it is reasonable to assume that the affected NASL owners would have to begin sales negotiations now. The sale and purchase of a major sports franchise is a considerable undertaking.

I also find, on the basis of NASL Commissioner Woosnam's affidavit, that as a consequence of the NASL's continuing battle for economic stability the league is "experiencing a significant degree of change in both the ownership and location of its franchises," so that "before the beginning of the NASL's 1979 playing season, controlling interests in as many as five NASL clubs are likely to be sold."[11] In those circumstances, the NASL has a vital interest in attracting potential new investors. The affidavits reveal, however, that the mere prospect of the NFL's proposed amendment has had a chilling effect upon presently football-ori-

dren, nephews and nieces, and relatives by marriage) (1) if such person directly or indirectly provided or contributed all or any part of the funds used to purchase or operate the other sports league entity, or (2) if there exists between such person and any such relative a significant community of interest in the successful operation of the other sports league entity.

"(C) The Commissioner shall investigate, to the extent he deems necessary or appropriate, any reported or apparent violation of this Section and shall report his findings to the Executive Committee prior to imposition of disciplinary action by the Committee.

"(D) Beginning on February 1, 1980, any person who, after notice and hearing by the Executive Committee, is found to have violated subsection (A) or (B) above will be subject to fines of up to $25,000 per month for each of the first three months of violations; up to $50,000 per month for each of the next three months; and up to $75,000 per month thereafter. In addition, violations of more than six months' duration may be dealt with by the Executive Committee pursuant to Article VIII, Section 8.13(B).

"(E) If such person does not pay such fine to the League Treasurer within 20 days of its assessment, the unpaid amount thereof may be withheld, in whole or in part, by the Commissioner from available funds in possession of the League Office belonging to the member club with which the person in violation is affiliated." Weiss affidavit at Exhibit B.

10. Apparently the Nordstroms take the position, *vis-a-vis* the NFL, that the "overlapping minority interest holders" comprising the Nordstrom Family Partnership are not subject to the amendment, "since none of them controls either team" (i. e., the Seattle NFL and NASL franchises). Rozelle affidavit at p. 22, ¶ 38. I need not resolve that issue. The present inquiry relates to the threat of harm to the NASL. The NFL does not appear to accept the Nordstroms' contention; Rozelle affidavit at p. 22, ¶ 39. Its position may be considered in assessing the potential effect of the NFL amendment upon the NASL.

11. Woosnam affidavit at p. 8, ¶ 15.

ented investors who might otherwise favorably consider ownership of an NASL franchise.[12]

These factors combine to establish the NFL cross-ownership ban as a source of harm to the NASL sufficiently grave and immediate to satisfy Second Circuit and Clayton Act Standards. Loss of the stabilizing Hunt, Robbie and Nordstrom presences[13] would be injurious in itself. The forced addition of three franchises to an already burdened market would have an obviously depressing influence, particularly when viewed in combination with the chilling effect of the ban upon potential new investors. I am not persuaded by the defendants' argument that the present cross-owners could elect to retain their NASL interests and divest themselves of their NFL holdings. According to Woosnam[14] the current value of an NASL franchise is $2 million and that of an NFL franchise in excess of $30 million. A cross-owner is not likely to abandon the latter for the former.

I find that plaintiffs have made a sufficient showing of immediate and irreparable harm to satisfy that requirement of a preliminary injunction.

B. *The Merits.*

On the merits, the question that arises is whether the cross-ownership ban is open to serious challenge on antitrust grounds.

■ With respect to the general applicability of the Sherman Act to the facts of this case, it is well-settled that the business of professional football is subject to antitrust scrutiny, *Radovich v. NFL*, 350 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957);

*Smith v. Pro Football, Inc.*, 193 U.S.App. D.C. ——, 593 F.2d 1173 (1978) *reprinted in* 1978 BNA ATTR No. 889 at E–1 (Nov. 16, 1978); *Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976), *cert. denied*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *Kapp v. NFL*, 390 F.Supp. 73 (N.D.Cal.1974), and there is no serious dispute but that enactment of the proposed by-law amendment would constitute an agreement among the NFL and its member teams sufficient to satisfy the "contract, combination . . . or conspiracy" language of section 1 of the Sherman Act, 15 U.S.C. § 1. *Denver Rockets v. All-Pro Mgmt., Inc.*, 325 F.Supp. 1049, 1062 (C.D.Cal.1971); *Kapp v. NFL, supra*, 390 F.Supp. at 81; *U. S. v. NFL*, 116 F.Supp. 319, 321 (E.D.Pa.1953). *Cf. Associated Press v. U. S.*, 326 U.S. 1, 11–12, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (bylaws of association in and of themselves a contract in restraint of trade).

■ Plaintiffs contend that the proposed cross-ownership ban constitutes an unlawful conspiracy or agreement among the NFL and its member clubs to deprive a competitor, the NASL, of a necessary competitive resource—sports entreprenurial know-how and capital—by eliminating a fertile source of that resource, to wit, NFL owners. Plaintiffs argue that the cross-ownership ban constitutes a classic group boycott, *per se* unlawful under the Sherman Act, e. g., *Klor's Inc. v. Broadway Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Associated Press v. U. S.*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1944); *Fashion Originators Guild v. F. T. C.*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949

---

**12.** The record contains ample and essentially undisputed evidence that some seven NFL owners (in addition to the current cross-owners) have recently expressed interest in acquiring all or part of various NASL franchises. (Woosnam affidavit at pp. 15–16, ¶ 27; Rozelle affidavit at p. 25, ¶ 44). In one instance in 1978, following discussions between Robert R. Hermann, Chairman of the Board of an NASL franchise and an NFL owner (concerning the latter's desire to purchase the soccer franchise), Mr. Hermann asserts he was told "point blank that there was no sense in proceeding any further with our conversations in light of

the NFL's stated intention to adopt and/or enforce" the cross-ownership ban. (Affidavit of Robert R. Hermann, September 21, 1978). A similar "chilling" as a result of the impending by-law amendment of another NFL owner's interest in purchasing a soccer franchise also apparently occurred within the past year. (Reply Affidavit of Philip A. Woosnam, October 27, 1978, at p. 3, ¶ 4).

**13.** No disrespect is meant to Mr. Bidwell.

**14.** Affidavit, pp. 8, 12, ¶¶ 13, 20.

(1940); *Drayer v. Krasner*, 572 F.2d 348 (2d Cir. 1978), or at best, a restraint of trade which must fall as unreasonable when tested under the rule of reason. *See generally, National Soc. of Prof. Engineers v. U. S.*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Standard Oil Co. v. U. S.*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Smith v. Pro Football, Inc., supra* ; *Mackey v. NFL, supra.* For the reasons that follow, I conclude that the *per se* rule of illegality usually applied to "horizontal" group boycotts is inapplicable to the concerted action at issue here, but that plaintiffs have raised sufficiently serious litigable questions going to the merits as to satisfy the second prong of the preliminary injunction test.

In his comprehensive analysis of boycott caselaw, Professor L. A. Sullivan limits the concept of the "classic group boycott," horizontal in nature, which is condemned as *per se* unlawful under the Sherman Act:

"If the *per se* rule respecting boycotts is to become coherent, we must recognize that it applies only where competitors engage together to inhibit others with whom they compete by depriving those others of elements needed in the competitive context." L. A. Sullivan, *Antitrust* p. 259.[15]

The Second Circuit in *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978), signalled its approval of the limitations Sullivan suggests upon the *per se* rule respecting boycotts (see note 17, *infra* ); as did the District of Columbia Circuit in *Smith v. Pro Football, Inc., supra*, a case which considered the validity of the NFL player draft.[16]

The Supreme Court has had occasion recently to observe that "the [boycott] decisions reflect a marked lack of uniformity in defining the term . . . express[ing] no opinion, however, as to the merits of any of [the proffered] definitions." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 542 and n. 14, 98 S.Ct. 2923, 2930 and n. 14, 57 L.Ed.2d 932 (1978). The Court quoted its prior decision in *FMC v. Svenska America Linien*, 390 U.S. 238, 250, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968), to the effect that " '[u]nder the Sherman Act, any agreement by a *group of competitors* to boycott a particular buyer or group of buyers is illegal *per se*,' " *id.* (former emphasis added), and concluded that "[w]hatever other characterizations are possible, [ ] petitioners' conduct may be viewed as 'an organized boycott,' *Fashion Guild v. Trade Comm.*, 312 U.S. 457, 465, 61 S.Ct. 703, 85 L.Ed. 949 (1941) . . . [in that petitioner] induced *its competitors* to refuse to deal on any terms with its customers." *Id.* at 2931 (emphasis added). The Supreme Court's focus in the *St. Paul* case appears to have been on whether the members of the boycotting group were competitors *inter se*, rather than on whether their action was aimed at harming competitors. In this sense, the Supreme Court's view of the classic group boycott may be somewhat broader than Professor Sullivan's, but under either approach a crucial element is agreement among competitors.

The problem with applying the "classic group boycott" label to the facts of this case lies in the peculiar relationship among the NFL and its member clubs. It is by now a well-recognized principle of the rele-

---

**15.** In Professor Sullivan's analysis, a boycott is "horizontal" when it operates, i. e., when its effect is felt, on the same market level at which the boycotting group operates. In short, it is a boycott of competitors by competitors. To be distinguished are "vertical" boycotts, as for example where a group of sellers agrees to withhold their product from a particular buyer with whom, of course, they do not compete. Sullivan focuses upon whether the boycotting group's target is or is not a competitor; he views the former situation as more pernicious and thus more appropriate for *per se* condemnation. L. A. Sullivan, *Antitrust*, pp. 229–232.

**16.** The *Smith* court adopted Professor Sullivan's definition of the classic group boycott but refused to apply a *per se* rule to the NFL player draft for two reasons. First, the court opined that notwithstanding competition among league members for players, the joint venture nature of the league made *per se* rules inappropriate. Second, the court found the NFL's player boycott to be vertical rather than horizontal. See note 15 *supra*. The restraint was found to be illegal, however, under the rule of reason.

vant caselaw (and the instant record does not demonstrate otherwise) that the members of a professional team sports league are more like "economic joint venturers" than competitors *inter se. E. g., Smith v. Pro Football, Inc., supra; Mackey v. NFL, supra; Levin v. N. B. A.,* 385 F.Supp. 149 (S.D.N.Y.1974); *San Francisco Seals, Ltd. v. N. H. L.,* 379 F.Supp. 966 (C.D.Cal.1974). This is not a case where sports league members—in competition with each other, e. g., for the services of players—concertedly impose restraints on those players, *e. g., Smith v. Pro Football, Inc., supra.* In short, because under these facts, the NFL teams are not economic competitors among themselves, their action does not fit the classic group boycott definition, at least as that has been articulated by Professor Sullivan.[17]

There is a substantial degree of judicial recognition, in antitrust cases, that the business structure of league team sports is unique. *Smith v. Pro Football, Inc., supra;*

*Kapp v. NFL,* 390 F.Supp. 73, 79–81, 88–89 (N.D.Cal.1974); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 462, 503–4 (E.D.Pa.1972); *Flood v. Kuhn,* 316 F.Supp. 271, 273–6 (S.D.N.Y.1970), *aff'd.,* 443 F.2d 264 (2d Cir. 1971), *aff'd.,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Molinas v. National Basketball Association,* 190 F.Supp. 241, 243–4 (S.D.N.Y.1961); *United States v. National Football League,* 116 F.Supp. 319, 323–6 (E.D.Pa.1953); *State of Milwaukee v. Milwaukee Braves,* 31 Wis.2d 699, 144 N.W.2d 1, 10 (1966). These authorities indicate that the NFL should not be regarded as an association of economic competitors attempting to shield concerted anticompetitive behavior behind a joint venture facade.[18] *Cf. United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). While neither the able presentations of counsel nor the Court's own research has uncovered a case dealing with

17. In *Oreck Corp., supra,* 579 F.2d at 131, the Second Circuit said:

" 'While the boycott concept is infinitely expandable, the *per se* doctrine ought not to be.' Sullivan, Antitrust 256 (1977), quoted in *Drayer v. Krasner,* 572 F.2d 348 (2d Cir. 1978). It is important to distinguish between 'horizontal' restraints, *i. e.* agreements between competitors at the same level of market structure, and 'vertical' restraints, *i. e.* combinations of persons at different levels of the market structure, such as manufacturers and distributors."

18. The rationale for a relaxed antitrust approach to league sports was stated in *United States v. National Football League, supra,* 116 F.Supp. at 323:

"Professional football is a unique type of business. Like other professional sports which are organized on a league basis it has problems which no other business has. The ordinary business makes every effort to sell as much of its product or services as it can. In the course of doing this it may and often does put many of its competitors out of business. The ordinary business man is not troubled by the knowledge that he is doing so well that his competitors are being driven out of business.

"Professional teams in a league, however, must not compete too well with each other in a business way. On the playing field, of course, they must compete as hard as they can all the time. But it is not necessary and indeed it is unwise for all the teams to compete as hard as they can against each other in

a business way. If all the teams should compete as hard as they can in a business way, the stronger teams would be likely to drive the weaker ones into financial failure. If this should happen not only would the weaker teams fail, but eventually the whole league, both the weaker and the stronger teams, would fail, because without a league no team can operate profitably."

In *Philadelphia World Hockey Club, supra,* 351 F.Supp. at 503–04 Judge Higginbotham stated generally:

"The sports field is in some ways a hybrid, in that it is both similarly and dissimilarly affected by the normal economic variables governing business success. For a corporation producing aluminum, any entrant in the field is a competitor. From a traditional oligopolist's or monopolist's view, one might consider any new entrant as an adversary and thus undesirable. But by the nature of a sports contest, there must always be an adversary. By analogy, who would enjoy Vida Blue blazing strikes across home plate when the batter's box was empty, or Mark Spitz' triumphs, if he were the only one in the pool. Sports teams need competition, and if there are more than two teams, some type of league is probably desirable.

"For maximum customer receptivity and profit it is in the best interest of any club that its opponents not generally be viewed by the public as totally incompetent and utterly unable to compete effectively."

the type of restraint at issue here, so that the lawfulness of the NFL's cross-ownership ban poses a question of first impression, I am presently persuaded that the NFL's structure, its particular business needs, and the lack of judicial familiarity with this type of restraint, combine to call for application of "rule of reason" principles to test the legality of the cross-ownership ban.[19]

■ Of course, the joint venture nature of the NFL does not pose an insurmountable barrier to plaintiffs' case. *Robertson v. NBA,* 67 F.R.D. 691, 694 n. 3 (S.D.N.Y. 1975). *See generally, Timkin Roller Bearing Co. v. U. S.,* 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). It is not a prerequisite to antitrust liability that "co-conspirators" be competitors of one another. *E. g., Tondas v. Amateur Hockey Ass'n,* 438 F.Supp. 310 (W.D.N.Y.1977); *DuPont Glore Forgan Inc. v. A. T. & T. Co.,* 437 F.Supp. 1104 (S.D.N.Y.1977); *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110 (S.D.N.Y.1976). Though united in a joint venture, the NFL members are discrete business entities—individuals, partnerships and corporations—whose concerted action can have antitrust implications, *Robertson, supra; Levin v. NBA,* 385 F.Supp. 149, 152 (S.D.N.Y.1974); *San Francisco Seals v. NHL,* 379 F.Supp. 966, 968, 970–71 (E.D.Cal.1974); *United States v. National Football League, supra.*

Viewing the cross-ownership ban in the light of the rule of reason, the decisive issue, recently articulated by the Supreme Court in *National Soc. of Professional Engineers v. U. S., supra,* is "whether the challenged agreement is one that promotes competition or one that suppresses competition." 435 U.S. at 691, 98 S.Ct. at 1365. Crucial to this evaluation is inquiry into "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed," to the end that the court may "form a judgment about the competitive significance of the restraint." In short, I must ultimately analyze the purpose and effect of the cross-ownership ban, *Oreck Corp. v. Whirlpool Corp., supra,* 579 F.2d at 133, and determine whether on balance its anticompetitive effects outweigh its pro-competitive benefits. *See e. g., Professional Engineers, supra; Continental T. V. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–51, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Plaintiffs are entitled to a preliminary injunction if, within the context of that controlling issue, they have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Jacobson, supra,* 548 F.2d at 442.

The NASL plaintiffs perceive two principal anticompetitive effects of the cross-ownership ban. First, they view the limited

---

**19.** The NASL makes the argument that *per se* rules have been deemed inappropriate—because of the joint venture nature of the league—only when the restraint at issue applies to *intra*-league competition. Plaintiffs would distinguish the instant case on the ground that the cross-ownership ban hinders *inter*-league competition, i. e. that between the NFL and the NASL. Thus, the NASL contends that the "joint venture" defense is unavailing to save this "group boycott" from *per se* condemnation.

I am not persuaded that the joint venture defense should be so narrowly construed. For example, *Philadelphia World Hockey Club, supra,* concerned a challenge by the World Hockey Association to the National Hockey League's player restrictions. The hindering of *inter*-league competition was clearly at issue, yet Judge Higginbotham refused to apply a *per se* rule to the alleged violation of section 1 of

the Sherman Act, largely because of the unique nature of the business of professional hockey. 351 F.Supp. at 503–04.

In one of its leading "boycott" cases, the Supreme Court opined that conduct which could be characterized as a "group boycott" might be saved from *per se* condemnation by a "justification derived from the policy of another statute *or otherwise." Silver v. N. Y. S. E.,* 373 U.S. 341, 348–49, 83 S.Ct. 1246, 1252, 10 L.Ed.2d 389 (1963) (emphasis added). Several commentators have "suggested that where collective action is inherent in the structure of the industry, as it is in sports leagues, the 'or otherwise' justification is present." Note, Professional Team Sports and the Antitrust Laws, 81 Harv.L.R. 418, 423 (1967), citing Note, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Colum.L.Rev. 1486, 1501 (1966).

number of individuals in the United States with sufficient wealth, interest, time and entrepreneurial skills to operate a major sports franchise effectively as a decidedly limited market, of which the present NFL members constitute a significant part. Plaintiffs claim that the cross-ownership ban obstructs the NASL from competing in that market, since under its terms present cross-owners are under pressure to divest themselves of NASL franchises, and new prospects cannot be approached if they are NFL owners, present or potential. Secondly, plaintiffs argue, this anticompetitive effect leads directly to another, since the coercions and restraints placed upon present and potential NASL owners serve to "undermine the stability, credibility and ability of the NASL to compete successfully with other sports, including the NFL" in the broader market for the public's entertainment dollar and leisure time.[20]

Defendants dispute the accuracy of these perceptions. They point out that investors and potential investors in NASL franchises come from many walks and stations of life, so that the limited market of wealth and skill described by plaintiffs is illusory. The NFL scoffs at the dire anticompetitive effect visualized by the NASL, paraphrasing the plaintiffs to say that "their dynamically growing venture would collapse in a trice if two or three of its 24 franchises change ownership contrary to the league's wishes between now and 1980."[21] Defendants proclaim the cross-ownership ban to be procompetitive in overall effect, primarily because it inhibits the "creeping merger of the two leagues through joint ownership."[22]

The issues presented are interesting, complex and to a degree novel, such as the NASL's perception of wealthy, sportsminded individuals as components of a market for which rival leagues compete. One suspects that until now Mr. Hunt had thought of himself as a competitor, and not a commodity. At times the parties' arguments cut both ways. Thus defendants' characterizations of the cross-ownership ban as procompetitive, because it would prevent merger of the two leagues through "joint ownership," does not wholly square with their downgrading of the economic importance of the entrepreneurial sub-market: if

---

**20.** Plaintiffs' main brief at pp. 39–40.

Plaintiffs make a third argument, that the cross-ownership ban runs afoul of the so-called "essential facility" doctrine of antitrust law. *See generally, Otter Tail Power Co. v. U. S.,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *U. S. v. Terminal R. R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). The District of Columbia Circuit's recent discussion of the doctrine provides a helpful summary of the law:

" '[W]here facilities cannot practicably be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility.' . . To be 'essential' a facility need not be indispensible; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants. Necessarily, this principle must be carefully delineated: the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately." *Hecht v. Pro-Football, Inc.,* 187 U.S.App.D.C. 73, 83, 570 F.2d 982, 992–93 (1977) (citations and footnotes omitted).

Two problems with the applicability of this theory to the case at bar come immediately to mind. First, the cases cited by plaintiffs all deal with tangible physical objects as "essential facilities." *Otter Tail, supra* (electricity transmission lines); *Terminal R. R., supra* (railroad switching facilities); *Hecht, supra* (football stadium); *Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317 (9th Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976) (flour mill); *U. S. v. Standard Oil Co.,* 362 F.Supp. 1331 (N.D.Cal.1972), *aff'd,* 412 U.S. 924, 93 S.Ct. 2750, 37 L.Ed.2d 152 (1973) (fuel storage facilities). The "essential facility" or "scarce resource" here is the sports capital and entrepreneurial skill of the NFL owners. Second, the cited cases all deal with situations where the defendant enjoyed a monopoly over the resource or facility. While it might be said that the NFL "monopolizes" NFL owners, I do not understand plaintiffs' position to be that the NFL monopolizes the entire field of "sports owners," *nor is this a necessary showing to establish the right to relief under the other theories pressed.* In sum, it seems that if the NASL succeeds on its primary theories of liability, then resort to "essential facility" law would be superfluous, if indeed it is applicable at all.

**21.** Defendants' brief at p. 31.

**22.** *Id.* at p. 32.

NASL has so many and so wide a variety of investors to choose from, why is a cross-ownership ban necessary to prevent a "creeping merger" of the NASL and NFL?

■ Measured by the rule of reason and its quintessential issue as articulated in *National Society of Professional Engineers* —the promotion or suppression of competition—it is evident that the case at bar presents serious questions forming a fair ground for litigation, including the discovery procedures now in progress. If no prior case delineates sports entrepreneurs as a market with which antitrust law is properly concerned, no case holds that the concept is too fanciful to have validity. The precise boundaries of that market, in the case at bar, present substantial issues of fact. The cross-ownership ban would limit the options of (a) NFL owners and their family members who also own an NASL franchise or contemplate such an interest; and (b) NASL franchises seeking to interest such individuals as investors. The restraints attendant upon such limitations of choice fairly implicate the antitrust laws. *United States v. New Orleans Insurance Exchange,* 148 F.Supp. 915, 920 (E.D.La. 1957), *aff'd,* 355 U.S. 22, 78 S.Ct. 96, 2 L.Ed.2d 66 (1957); *United States v. Insurance Board of Cleveland,* 188 F.Supp. 949, 955 (N.D.Ohio 1960). I find no meaningful relationship between the proposed by-law amendment forming the subject matter of the instant case and the rejection by a professional basketball league of certain individuals for franchise ownership in *Levin v. National Basketball Association,* 385 F.Supp. 149 (S.D.N.Y.1974), upon which defendants rely. That rejection in *Levin* was *ad hoc, ad hominem,* and, as Judge Owen properly held, quite without antitrust implications. Such implications abound in the case at bar.[23] It is difficult for defendants to deny any anticompetitive intent for the cross-ownership ban, in the face of Commissioner Rozelle's explanatory statement of June 28, 1978 to the NFL owners, which included the following discussion as a reason for the ban:

> "The NFL's success depends on fan interest and loyalty. The League competes with other major team sports for that interest and loyalty, as well as for gate receipts, television revenues, advertising dollars, and media coverage. Connections with NFL personnel may well enhance these competing team sports, both in fact and in the public's perception, at the expense of the NFL."[24]

In sum, there are present in this case merits issues of sufficient doubt and moment to satisfy the *Sonesta* and *Jacobson* tests.

## C. *The Balance of Hardships.*

No extended discussion is necessary to demonstrate that the balance of hardships tips in favor of plaintiffs. The adverse effects to the NASL attendant upon immediate implementation of the cross-ownership ban have been considered *ante.* Those effects may not be capable of precise calculation, but the potential is real. By way of contrast, the NFL points to no factor indicating that it will be harmed if a policy declared in 1967, but not sought to be enforced until 1978, is kept on the bench during the pendency of this litigation.

The parties have devoted some energy to debating whether the granting of a preliminary injunction to plaintiffs would preserve or disturb the *status quo.* Clearly it is the former. The NFL made no meaningful efforts to enforce the cross-ownership ban, first declared in a resolution in 1967, until

---

**23.** Assuming *arguendo* that the cross-ownership ban violates the antitrust laws, that it has not yet been formally enacted or put into effect is irrelevant: "Combinations are no less unlawful because they have not as yet resulted in restraint. An agreement or combination to follow a course of conduct which will necessarily restrain or monopolize a part of trade or commerce may violate the Sherman Act, whether it

be 'wholly nascent or abortive on the one hand, or successful on the other.'" *Associated Press v. U. S.,* 326 U.S. 1, 12, 65 S.Ct. 1416, 1421, 89 L.Ed. 2013 (1945) *quoting U. S. v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 225, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**24.** Affidavit of Donald Weiss, NFL Executive Director, September 25, 1978, at Exhibit B.

the 1978 proposed amendment, with its forced divestiture and Draconian penalties for non-compliance. Transforming a toothless tabby into a sabre-tooth tiger is no way to preserve the *status quo*. The NFL's serene portrayal of cross-owners, cheerfully and without resentment, exercising their best efforts to divest themselves of other interests even prior to the proposed amendment, does not withstand analysis. Thus Hunt has expressed concern at the timing of an enforced divestiture.[25]

For the purposes of this motion, the Court need not accept or reject plaintiffs' contention that the NFL's proposal to implement the cross-ownership ban at this time stems solely from anticompetitive animus toward the NASL, just as the latter begins to succeed. I recognize that the

NFL asserts quite different motivations.[26] Resolution of this and other fact issues must await trial. It is sufficient for the present to say that the NFL's recently declared intent to implement a cross-ownership ban disturbs the *status quo* in such a manner as to tip the balance of hardships in favor of plaintiffs; and that the other requisite elements are also established, thus entitling them to a preliminary injunction.

## CONCLUSION

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a), F.R.Civ.P.

A preliminary injunction will issue, restraining the NFL and its member clubs, pending the final resolution of this case,

---

**25.** Defendants have submitted an exchange of letters between Lamar Hunt and Pete Rozelle, spanning the period of August 11, 1972 to March 8, 1977. The correspondence concerns Mr. Hunt's willingness and efforts to comply with the NFL policy resolutions on cross-ownership. Mr. Hunt's letters reveal his concern with being forced into divestiture at a time when there was little or no market for NASL franchises. His perceptions as to investor reaction to the sale of a "Hunt" business are instructive:

"The soccer investment of myself and my children (for which I am obviously responsible) is a *very* substantial one—unfortunately, at this point more than I expected. Though the picture looks infinitely brighter for the sport, it is still a long way from reaching fruition for the investors and, in fact, at present there is virtually no market for a going club—especially one owned by a 'Hunt.' (We have a historically bad record for selling any business for buyers seem to feel that anything we are selling must really be a 'dog.'" Letter from Lamar Hunt to Pete Rozelle, at 1 (November 12, 1973).

More recently, Hunt has said:

"I am informed that NFL Commissioner Pete Rozelle has filed an affidavit in this action indicating that (i) I am in complete accord with this latest proposed rule by the NFL to bar NFL owners from having an interest in other team sports, and (ii) I am presently *desirous of selling my other team sports* interests. Neither of these assertions is true. In the past I have reluctantly indicated to the other owners in the NFL that, if they required me to do so, I would sell my interests in other team sports, specifically soccer and basketball, at an appropriate time when proper financial arrangements could be made

in order to protect my investments in those franchises. However, as a businessman, I do not want to be in a position where I would be forced to sell either my soccer or basketball interest by a specified date and under threat of compulsion. Such a requirement would, in my view, jeopardize the substantial investment I have made in particular in my soccer franchise over the last twelve years. In fact, at the present time, it is not my desire to relinquish my ownership in the Dallas Tornado (or the Chicago Bulls for that matter) unless I am compelled to do so by the cross-ownership ban proposed by the NFL." Affidavit of Lamar Hunt, October 26, 1978, at p. 2, ¶ 3.

**26.** The business justifications urged by defendants in support of the cross-ownership ban are summarized in the NFL's brief at p. 6:

"(1) protection of commercial confidentiality;

"(2) preservation of good relations with the public, including

(a) avoiding dilution of the goodwill which a prominent local NFL 'salesman' wins for the entire NFL;

(b) remaining untarnished by adverse fan reactions to publicly visible owners whose activities in other sports may arouse local hostility;

(c) taking the procompetitive side of the public debate concerning the proper role of sports ownership 'magnates' or human 'conglomerates'; and

"(3) encouragement of maximum cooperation, and minimizing animosity and suspicion, among the NFL member joint-venturers."

from implementing by by-law amendment or otherwise its cross-ownership ban.

The giving of security by plaintiffs is referred to both by Rule 65(c) and 15 U.S.C. § 26. The present motion papers do not address this issue. Counsel should do so in connection with settling the order.

Counsel for plaintiffs are directed to settle an order and form of injunction on five (5) days' notice.