**C. Richard McDANIEL, Jim Fallon Oldsmobile, Inc., and Ethel Newfield, Successor Assignee to Samuel Newfield, Deceased, Assignee for the Benefit of Creditors of Jim Fallon Oldsmobile, Inc., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, David L. Neisch, Joseph Fox and Merry Oldsmobile, Inc., Defendants.**

No. 73 C 1505.

United States District Court,
E. D. New York.

Nov. 13, 1979.

Corso & Engelberg, Jericho, N. Y., for plaintiffs by Richard A. Engelberg, Jericho, N. Y.

Davis, Polk & Wardwell, New York City, for defendants General Motors Corporation and Neisch by Guy Miller Struve, Robert F. Wise, Jr., James D. Liss, New York City, and Otis M. Smith and Nicholas J. Rosiello, Detroit, Mich., of counsel.

Brand & Brand, Garden City, N. Y., for defendants Fox and Merry Oldsmobile, Inc.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiffs in this private antitrust action are a former franchised Oldsmobile dealership located in Bethpage, Long Island ("Fallon"); C. Richard McDaniel, an unsuccessful applicant to succeed Fallon in Bethpage; and Ethel Newfield, the successor assignee for the benefit of the creditors of Fallon. The defendants are General Motors Corporation ("G.M."); David L. Neisch, the New York Zone Manager of G.M.'s Oldsmobile Division during the period in suit; Merry Oldsmobile, Inc. ("Merry"), the successor to Fallon in Bethpage; and Merry's dealer· operator, Joseph Fox, against whom are alleged twelve causes of action, five of which assert violations of federal law. Two such counts charge G.M. with restraint of trade in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; one charges G.M. with attempt to monopolize and monopolization; one asserts that all defendants conspired to restrain trade in violation of section 1 of the Sherman Act; and the remaining federal cause of action alleges acts in violation of the Dealer-Day-in-Court Act, 15 U.S.C. § 1221 et seq. Plaintiffs' other claims are governed by State law. After extensive discovery, the action is now before the court on defendants' motion for summary judgment pursuant to Rule 56, F.R.Civ.P.

■ Summary judgment may be rendered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R.Civ.P. Pursuant to the 1963 amendments, Rule 56(e) provides that when a motion for summary judgment is supported by proper affidavits (or by the other materials referred to in Rule 56(c)), "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by· affidavits or as otherwise provided in this rule, must set forth specific facts ˙showing that there is a genuine issue for trial." As the Court of Appeals for this circuit recently stated, once the movant has made the requisite showing,

"an adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion must set forth 'concrete particulars,' *Dressler v. The MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964), and cannot make a secret of his evidence, holding it close to his chest until the trial. *See Donnelly v. Guion*, 467 F.2d 290, 291 (2d Cir. 1972). It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion. *Id.* at 293. *See Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970)." *Securities Exchange Commission v. Research Automation Corp.*, 585 F.2d 31, 33 (2 Cir. 1978).

■ In determining whether to grant a motion for summary judgment, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2 Cir. 1967), *quoted in Securities Exchange Commission v. Research Automation Corp., supra*, 585 F.2d at 33. It must accept as true factual statements in the opposing party's affidavits, draw all permissible inferences in that party's favor, *Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2 Cir. 1976), and resolve any doubts in favor of the latter, *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., supra.* It is true, moreover, that summary· judgment should be used sparingly in the context of antitrust actions, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and should be granted

only after affording plaintiffs ample opportunity for discovery, *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

"The very mission of the summary judgment procedure [however] is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Adv. Com. Note to Proposed Amendments to Rule 56(e), 31 F.R.D. 648 (1962). See generally *Applegate v. Top Associates, Inc., supra; Donnelly v. Guion, supra*, 467 F.2d at 292. Hence, a party may not retreat to "the mere allegations or denials of his pleading" in face of "a motion for summary judgment made and *supported* as provided in . . . [Rule 56]." Rule 56(e), F.R.Civ.P. (emphasis supplied). See generally *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5 Cir. 1979); *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1167 (7 Cir. 1978), *cited in Ambook Enterprises v. Time Inc.*, 612 F.2d 604, 621–623 (2 Cir., 1979) (Moore, J., dissenting).

With these principles in mind, it is the court's view that summary judgment on the antitrust claims is appropriate. The facts in this case have been fully developed through more than six years of discovery proceedings, and the issues that bear on the resolution of the antitrust claims are not the subject of conflicting affidavits. Since there are no genuine issues of material fact concerning our resolution of those claims and the law supports defendants' position, they are ripe for decision in defendants' favor.

## Background

On December 5, 1969, Fallon, with its dealer operator James Fallon, was appointed as the Oldsmobile dealership at Bethpage, Long Island. The relationship between the Oldsmobile Division and Fallon was governed by the Oldsmobile Dealer Sales and Service Agreement ("Agreement") which became effective November 1, 1970. While in no way restricting a dealership's ability to dispose of its assets, the Agreement expressly reserved to the Oldsmobile Division the right to grant or confer franchise rights and privileges:

"In view of the nature, purposes and objectives of an Oldsmobile Dealer Sales and Service Agreement, Oldsmobile expressly reserves to itself its right to grant or confer franchise rights and privileges covering the sale and service of Oldsmobile motor vehicles upon, and its freedom to contract through its execution of Dealer Sales and Service Agreements with, dealership entities selected and approved by Oldsmobile.

"Accordingly, this Agreement and the franchise rights and privileges conferred upon Dealer hereunder are not transferable, assignable, or salable by Dealer, and no property right or interest, direct or indirect, in this Agreement or such franchise rights and privileges is sold, conveyed or transferred by Oldsmobile to Dealer hereunder.

"Dealer shall not transfer or assign or attempt to transfer or assign any other right or transfer or delegate any obligation or responsibility of Dealer under this Agreement unless it shall have been approved in writing by Oldsmobile." (Agreement, Paragraph Second.)

Thus, under the Agreement, the right to use Oldsmobile trademarks and service marks is not subject to unilateral transfer by the franchisee.

Paragraph Third of the Agreement states that:

"This Agreement is a personal service contract and is entered into by Oldsmobile with Dealer in reliance upon and in consideration of the personal qualifications, and the representations made to Oldsmobile with respect thereto, of the following named person or persons who, it is agreed, will substantially participate, both of record and beneficially, in the ownership of dealer (hereinafter called Owner or Owners) and/or will actively manage the Dealership Operations (hereinafter called Dealer Operator or Operators):

"For the purpose of this Agreement the person or persons designated above shall

be responsible for any act or omission of any of Dealer's agents or employes which may be contrary to the purposes and objectives of this Agreement or to any provision of this Agreement.

"Concurrently with the execution of this Agreement, Oldsmobile has endorsed its approval of the ownership, financial interests and active management of Dealer as represented by Dealer on a 'Dealer Statement of Ownership, Financial Interests and Active Management' form supplied by Oldsmobile. No change in such ownership, financial interests or active management of Dealer shall be made without the prior written approval of Oldsmobile. Any such approved change shall be evidenced by the execution of a new 'Dealer Statement of Ownership, Financial Interests and Active Management'."

And Sections 11(B)(2) and (4) of "Additional Provisions Applicable to the Agreement," which are incorporated by reference, provide that the Agreement may be terminated for such acts or events as the following:

"(2) Any misrepresentation to Oldsmobile by Dealer or by any other person named in Paragraph THIRD hereof in applying for this agreement or any misrepresentation to Oldsmobile by Dealer or any such person as to the record or beneficial ownership or as to the management of Dealer.

\* \* \* \* \* \*

"(4) Any sale, transfer, relinquishment, voluntary or involuntary, by operation of law or otherwise, of any interest in the record or beneficial ownership of Dealer or any transfer or relinquishment of or change in the active management of Dealer, without the prior written approval of Oldsmobile." (Additional Provisions at 15–16.)

Defendants rely upon the foregoing provisions to justify their conduct with respect to the Fallon dealership.

In early 1973, Fallon encountered serious financial difficulties. It failed to pay New York State sales taxes in excess of $100,000 and in April lost its credit line with General Motors Acceptance Corporation. The loss of this credit line resulted in a situation in which automobiles purchased from Fallon had to be warehoused at the expense of the Oldsmobile Division until Fallon had received payment from its customers. According to defendants, Jim Fallon attempted in April and May to find new investors without success, and on June 8th telephoned defendant Neisch and asked if he had a possible purchaser of the assets of Fallon in mind. Apparently as a result of this inquiry, defendant Fox, who was at that time the dealer/operator of Crown Oldsmobile, Inc. ("Crown") in the Bronx, contacted Fallon and subsequently informed Neisch that he had reached an agreement for the purchase of Fallon's assets and that a formal contract had been drafted and sent to Mr. Fallon.

On June 25, 1973, plaintiff McDaniel also informed Neisch that he had reached an agreement on or about June 20th to purchase Fallon's assets, subject to his appointment by Oldsmobile as the dealer/operator at Bethpage, and submitted an application for his appointment.

While considering McDaniel's application, the Oldsmobile Zone Office, which was responsible in the first instance for decision on the application, was informed by defendant Fox in a letter dated July 6, 1973, that there were two undisclosed investors in Fallon Oldsmobile, Thomas Renda and Dr. George Goldstein, and that they were worried that McDaniel had entered into a side agreement with Fallon. Further investigation disclosed that Fallon did have partners (although they initially all denied their participation) and that McDaniel did agree to provide Jim Fallon two new cars for a year and to continue him in the hospitalization program.

Neisch, as the Manager of the Oldsmobile Zone Office, recommended that McDaniel's application for appointment be disapproved. He stated three reasons: (1) that McDaniel was already the dealer/operator of three Lincoln-Mercury dealerships, one of which was in the proximity of Fallon's Bethpage dealership and which could be expected to

compete with the Oldsmobile dealership for new car sales; (2) that at his other dealerships, McDaniel had remained an active dealer/operator for only a short time, eventually relinquishing day-to-day management to a general manager; and (3) that McDaniel had not told the truth at first about side agreements with Fallon. Neisch also expressed concern about the undisclosed investors in Fallon. On July 16, 1973, McDaniel's application was disapproved on the basis of Neisch's comments.

The agreement entered into by Fallon and the undisclosed investors, Renda and Dr. Goldstein, revealed that only 37.5% of the stock of Fallon Oldsmobile was owned by Jim Fallon and that debts in excess of their stock ownership were due Renda and Goldstein. This was in direct conflict with various statements executed by Jim Fallon in 1969 and 1970 as part of the application process in which he had represented that no other person had an ownership interest in Fallon Oldsmobile. Thus, it was apparent that Fallon had violated Sections 11(B)(2) and (4) of the Additional Provisions Applicable to its Agreement with the Oldsmobile Division by an unauthorized transfer of ownership of Fallon without the Division's prior written consent. In light of this violation and the precariousness of Fallon's financial condition, the decision was made to terminate Fallon, and this intention was made known to Jim Fallon by letter dated July 18, 1973, which deferred termination for two weeks to afford him an opportunity to sell the dealership assets before it took effect. The actual termination occurred on August 6, 1973, before Fallon had sold its assets.

The foregoing is not disputed by plaintiffs in any material respect. They suggest, however, that the crucial facts in this litigation concern the appointment of defendant Joseph Fox to succeed Fallon in Bethpage. In 1972, Fox became aware that an Oldsmobile service facility was to be established approximately two miles from Fox's Crown Oldsmobile in the Bronx. Fox was greatly disturbed that the service facility, Dale Oldsmobile, would divert new car customers from Crown and would sooner or later destroy his business. At a meeting with G.M. officials on or about June 13, 1973, it was agreed that an attempt would be made to relocate Fox. Despite this assurance, Fox and some others not here relevant, decided to invoke the Umpire Appeal grievance procedure set up by G.M. At approximately the same time, Fox and soon thereafter, McDaniel, began negotiations with Fallon for the sale of its assets in Bethpage, and each apparently entered into some sort of understanding with Fallon. Although the McDaniel offer was best from Fallon's perspective, his application was disapproved by G.M. on July 16, 1973, on the previously stated grounds.

On July 9, 1973, a week before McDaniel was turned down, Fox wrote to G.M. formally indicating his desire to sell his Crown dealership, and on July 18, 1973, G.M. responded by assuring Fox it would not offer a Dealer Sales and Service Agreement for the Bethpage point "to any other party during a period of 60 days subsequent to the date hereof." On this same date, G.M. informed Fallon that it would be terminated in two weeks so that during that period Fallon might be able to arrange to sell its physical assets to a third party "in the anticipation that such party will qualify and be appointed by Oldsmobile to succeed you as the Oldsmobile dealer at Bethpage, New York." On July 18th, G.M. also informed Fallon that McDaniel would not be an acceptable successor.

Defendant Merry Oldsmobile, with its dealer operator Fox, was appointed as the Oldsmobile dealership in Bethpage on September 20, 1973. As previously noted, Fallon was terminated before it sold its assets. Thus, plaintiffs argue basically that defendants restricted Fallon's ability to deal with anyone other than Fox, which they contend violated various federal and State laws.

### The Sherman Act Claims
#### Section 1 Claims

Although it is not altogether clear, the thrust of plaintiffs' antitrust claims appears to be that G.M. entered into an agreement

with Fox in which Fox would be assured of obtaining the Bethpage Oldsmobile dealership at a favorable price—since G.M. would apparently approve no one else—in return for his acquiescence in the establishment of Dale Oldsmobile in the Bronx. This, it is asserted, deprived Fallon of the ability to sell its assets at a price above their cost and thereby made "the buyer [Fox] the monopolist in regard to the price he will pay while at the same time ousting potential buyers from entering the market." (Plaintiffs' Memorandum at 10–11.) Thus, plaintiffs appear to argue that there is a market for the sale of Oldsmobile franchises, or at least a market for the sale of Oldsmobile automobiles, that is restrained in violation of the antitrust laws by defendants' conduct.

■ Under the facts presented, it is apparent that while defendants' conduct most certainly affected plaintiffs, it did not affect competition within the meaning of the antitrust laws since the "purpose of the Sherman Act is to protect competition, not competitors." *Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876, 885 (S.D.N.Y.1968), *aff'd*, 405 F.2d 319 (2 Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 77 (1969). This leads us to the same conclusion this court reached in *Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110 (E.D.N.Y.1976): even assuming defendants conspired to eliminate Fallon and replace it with Fox at Bethpage, such conduct is without antitrust significance.

> "It is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. . . . A refusal to deal becomes illegal under the Sherman Act only when it produces an unreasonable restraint of trade, such as price-fixing, elimination of competition, or creation of monopoly. . . . A mere unilateral change of distributors is not an unusual business practice, nor is it a violation of the antitrust laws." *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1248 (5 Cir. 1975) (citations omitted).

See also *Aladdin Oil Co. v. Texaco, supra*, 603 F.2d 1107 (5 Cir. 1979); *Fuchs Sugar & Syrup, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030 (2 Cir. 1979); *Golden Gate Accept. Corp. v. General Motors Corp.*, 597 F.2d 676, 678 (9 Cir. 1979); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2 Cir.) (*en banc*), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Marquis v. Chrysler Corp.*, 577 F.2d 624, 640 (9 Cir. 1978); *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683, 686 (6 Cir. 1976); *Diehl & Sons, Inc. v. International Harvester Co., supra*, 426 F.Supp. at 119.

Under this line of authority, plaintiffs must show that defendants' conduct was designed to further some collateral activity prohibited by the antitrust laws, such as collaboration to maintain control of prices. They argue that because Fallon could not sell his dealership to the highest bidder, because McDaniel was foreclosed from competing for the Bethpage franchise, and because McDaniel was unable to compete with other Oldsmobile dealers since he was not appointed by defendants, the defendants have committed a restraint of trade in violation of the antitrust laws (Plaintiffs' Memorandum at 19(A)). These are hardly the sort of restraints proscribed by the antitrust laws. Rather, they are merely the result of defendants' apparently lawful decision to terminate Fallon and replace it with Fox rather than McDaniel or any other applicant as a part of their own marketing strategy. Since defendants' conduct does not run afoul of the antitrust laws, it is inconceivable that adverse effects on plaintiffs of that conduct should violate these laws without some evidence competition has been adversely affected. The court declines to hold that it does.

The authority relied upon by plaintiffs, *Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453 (W.D.Pa.1968); *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1973), *rev'd*, 497 F.2d 577 (3 Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); and *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3 Cir. 1975), was considered by this court in *Diehl & Sons, Inc. v.*

International Harvester Co., supra. There we refused to find an unreasonable restraint of trade arises out of a manufacturer's decision, standing alone, to squeeze a dealer out of business based on the theory that competition is adversely affected because a would-be distributor might have charged lower prices than other distributors of the same product for the same manufacturer. 426 F.Supp. at 119, n.12. While we doubt the soundness of such a proposition, the court also notes that the cases arising in the Third Circuit all involve allegations that automobile manufacturers employed predatory practices in attempts to monopolize the retail market in their own products, contentions not even colorably present in this case.

■ Here, moreover, there is no suggestion that defendants' conduct was designed in any manner to eliminate competition at the retail level rather than to satisfy a lawful aim to promote competition at the manufacturing level through a change in the distribution network. Cf. Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3 Cir. 1979). Nor has it been demonstrated that defendants' conduct has had any anticompetitive effect. Thus, plaintiffs' claims that defendants have restrained trade in violation of section 1 of the Sherman Act are wholly without merit. See Aladdin Oil Co. v. Texaco, Inc., supra. As the court noted in Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093, 1094 (3 Cir. 1972), "it is undisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A." See also Aladdin Oil Co. v. Texaco, Inc., supra; Fuchs Sugars & Syrup, Inc. v. Amstar Corp., supra ; Burdett Sound, Inc. v. Texaco, Inc., supra ; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 78 (9 Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

*Section 2 Claims*

■ : The essence of a violation of section 2 of the Sherman Act is monopoly power. Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 272 (2 Cir. 1979). A plaintiff, moreover, must show that the defendant has engaged in the willful acquisition or maintenance of that power. United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The power referred to is the ability "to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), quoted in Berkey Photo, supra, 603 F.2d at 272. "Section 2 . . . is aimed primarily not at improper conduct but at a pernicious market structure in which the concentration of power saps the salubrious influence of competition. . . But, to avoid the proscriptions of § 2, the firm must refrain from conduct directed at smothering competition." Berkey Photo, Inc. v. Eastman Kodak Co., supra, 603 F.2d at 272, 275.

■ Finally, to attempt to monopolize under the section, a defendant must have a specific intent to monopolize, demonstrated by an overt act or acts, and must have a dangerous probability of success of monopolizing the relevant market. See Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019 (2 Cir. 1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); Kreager v. General Electric Co., 497 F.2d 468, 471 (2 Cir.), cert. denied, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); Diehl & Sons, Inc. v. International Harvester Co., supra.

In the view the court takes of plaintiffs' section 2 theory, its fatal flaw is evident: there is simply no proof of the relevant market, which is the basis of the section's prohibition. See Walker Process Equipment, Inc. v. Food Machine & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Plaintiffs argue, however, that they have shown the existence of two relevant markets: the market for the

transfer of Oldsmobile franchises and the market for the sale of Oldsmobile automobiles. Neither is sufficient under the facts presented.

■ There can be no relevant market in Oldsmobile dealerships for the simple reason that, in the actual wording of the Oldsmobile Dealer Sales and Service Agreement entered into between the parties, rights under the Agreement "are not transferable, assignable, or salable by Dealer." Thus, the cases cited by plaintiffs for the proposition that franchises constitute such a relevant market are distinguishable. In *Twin City Sportserv, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9 Cir. 1975), the court determined that a relevant franchise market could exist. There, however, the franchisee concessionaire was at liberty to assign its franchise right under contract. *Id.* at 1269. See also *San Francisco Seals, Ltd. v. National Hockey League*, 379 F.Supp. 966 (C.D.Cal.1974); *Philadelphia World Hockey C. v. Philadelphia Hockey C.*, 351 F.Supp. 462 (E.D.Pa.1972). The Third Circuit decision in *American Motors Inn, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3 Cir. 1975), is equally distinguishable. Defendant Holiday Inns not only licensed its trademark to franchisees but also owned and managed a number of inns itself and thus was also in competition with its franchisees. The court determined that Holiday Inns' procedure of issuing "radius letters" to existing franchisees in the area of an applicant's proposed hotel site ran afoul of the antitrust laws since objections were treated as a veto of the application by Holiday Inns, precluding further intrabrand competition and creating a horizontal allocation of the market. *Id.* at 1242. In the instant case, however, the issue involves not the sale of another franchise but the termination of one franchisee with its replacement by another. In these circumstances, even assuming that a relevant franchise market exists, it is apparent that defendants' conduct in terminating Fallon and its effects on competition are quite different from Holiday Inns' conduct in refusing to franchise an inn within a certain distance of objecting, and would-be competing franchises.

Plaintiffs also argue that the sale of Oldsmobiles constitutes a relevant market. This court had occasion to treat this very issue in *Diehl & Sons, Inc. v. International Harvester Co., supra*. No compelling reason to depart from the conclusion reached in that case has been demonstrated. In *Diehl*, we declined to follow the lower court decisions in the Third Circuit that stand broadly for the proposition that notwithstanding an automobile manufacturer's natural monopoly over its own products, it may violate section 2 if it employs predatory practices in an attempt to monopolize the retail market in its own product. We determined that the rationale supporting this proposition was flawed inasmuch as it clearly seeks to protect the competitor and not competition as intended by the antitrust laws. 426 F.Supp. at 121. Since product competition turns on the reasonable interchangeability of available goods considering price, use and quality, *United States v. E.I. du Pont de Nemours & Co., supra*, 351 U.S. at 380, 76 S.Ct. 994, the existence of reasonably interchangeable automobiles precludes any finding that competition has been restrained in any material manner. See *Merit Motors, Inc. v. Chrysler Corp.*, 417 F.Supp. 263, 269 (D.D.C.1976), *aff'd on other grounds*, 187 U.S.App.D.C. 11, 569 F.2d 666 (D.C.Cir.1977); *Mogul v. General Motors Corp.*, 391 F.Supp. 1305, 1313 (E.D.Pa. 1975), *aff'd*, 527 F.2d 645 (3 Cir. 1976).

■ Finally, although plaintiffs argue that the law is unsettled with respect to the requirement that a relevant market be demonstrated in an action asserting an attempt to monopolize in violation of section 2, this is hardly true. See, *e. g., Kreager v. General Electric Co., supra*, 497 F.2d at 471; *Diehl & Sons, Inc. v. International Harvester Co., supra*, 426 F.Supp. at 120–21. Accordingly, defendants' motion for summary judgment dismissing the federal antitrust claims is granted.

### *Dealer-Day-In-Court Act Claim*

Fallon's fifth cause of action alleges defendants' conduct violated provisions of the

DDICA, which protects automobile dealers against manufacturers' failures to "act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. "Good faith" is defined in the Act as

> "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221(e).

 Failure to act in good faith sufficient to bring the Act's proscriptions into play is a limited concept, however, and is found only where there is evidence of a wrongful demand enforced by threats of coercion or intimidation. See *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 561 (2 Cir. 1970); *Diehl & Sons, Inc. v. International Harvester Co., supra*, 426 F.Supp. at 124. See also *Marquis v. Chrysler Corp.*, 577 F.2d 624, 633 (9 Cir. 1978); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 910–12 (9 Cir. 1978); *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683, 685 (6 Cir. 1976); *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 514 (10 Cir. 1976). Without proof of lack of good faith within the meaning of the Act, there can be no relief under the DDICA, *Pierce Ford Sales, Ind. v. Ford Motor Company*, 299 F.2d 425, 430 (2 Cir.), *cert. denied*, 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962), even for arbitrary decisions with respect to termination of a dealership, *Overseas Motors, Inc. v. Import Motors Limited, Inc.*, 519 F.2d 119, 125 (6 Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1970); *Unionvale Sales Ltd. v. World-Wide Volkswagon Corp.*, 299 F.Supp. 1365, 1367 (S.D.N.Y.1969).

Plaintiffs allege that Fallon's termination was for the purpose of coercing it to accept Fox as its successor or forcing Fallon to abandon its dealership. Plaintiffs add that the evidence shows there was no "bona fide termination for hidden ownership or mere substitution of dealers." (Memorandum in Opposition at 34; Fallon Affidavit dated 1/3/79; Plaintiffs' Exhibits 19A–19C.) For their part, defendants argue that recovery under the Act is predicated upon a wrongful demand which would be enforced by sanctions in the case of noncompliance. Since the termination sent to Fallon was unconditional and merely deferred the effective date of termination by two weeks, allegedly to afford Fallon time to sell its assets before termination, defendants contend their conduct did not violate the Act. They also suggest that the termination was pursuant to contract. Thus, the argument goes, the termination could not have been intended to force Fallon to accept Fox as its successor.

*Fray Chevrolet Sales, Inc. v. General Motors Corp., supra*, cited as defendants' principal authority, is directly in point. There plaintiffs formerly operated a Chevrolet franchise and claimed defendant's refusal to approve the transfer of the franchise to a buyer of their choice violated the DDICA and the antitrust laws. The facts of the case as recited by the court are not unlike those presented here:

> "Appellants charged that GM refused to approve the transfer to Joslin, not because he was unqualified, but because GM had 'promised' the franchise to Andrews, purportedly for GM's intracorporate reasons. By GM's refusal to approve the transfer to Joslin, appellants claim that they lost the benefits of a favorable lease and of a sale of their dealership properties (*to wit*, accessories, gas, parts, tires, shop equipment, fixtures) to Joslin for $137,000, the transaction being 'subjected to [Joslin's] approval' by GM. Joslin and appellants failing to consummate the sale because the dealership properties were substantially less valuable to one lacking a GM franchise, appellants thereafter sold their dealership properties to

Andrews, the 'approved' transferee." 536 F.2d at 684.

While finding that the statutory duty of good faith applied to GM's refusal to approve or approval of the transfer, the court concluded that summary judgment was appropriate since there was no issue of fact concerning defendant's lack of statutory good faith: appellants failed to claim that GM warned them to transfer the franchise or risk termination; thus, in the absence of an "either-or" attempt at coercion or intimidation, the fact that appellants felt themselves coerced was of no consequence under the Act. *Fray Chevrolet Sales, Inc. v. General Motors Corp., supra*, 536 F.2d at 685.

■ As this court has already recognized, a manufacturer's wrongful demand can be implicit, inferable from "all the facts and circumstances without a showing of a formal demand." *Diehl & Sons, Inc. v. International Harvester Co., supra*, 426 F.Supp. at 124; *Marquis v. Chrysler Corp., supra*, 577 F.2d at 634. Such a demand must nonetheless appear from the record. While plaintiffs' situation might well call for remedial action, Congress' initial effort at regulation of the relationships between automobile manufacturers and their dealers embodied in the DDICA falls short of providing a basis for relief in these circumstances. Thus, summary judgment dismissing the claim under the Act is appropriate at this time.

This conclusion is compelled by the absence of any demand, express or otherwise, that plaintiffs do or refrain from doing some act at the risk of termination. Plaintiffs admit that Fallon initially broached the subject of a sale of the "dealership" with defendants. Defendants rejected McDaniel's application almost simultaneously with sending Fallon its notice of termination. Thereafter, although defendants' actions might have had the effect of "forcing" a sale of the dealership property to Fox, defendants' "preferred candidate," they made no demand upon plaintiffs to sell to Fox enforced by threats of coercion in violation of their duty to act in statutory good faith. See *Fray Chevrolet Sales, Inc. v. General Motors Corp., supra.*

■ Finally, plaintiffs' bald assertion that invocation of Fallon's unauthorized transfer of an interest in the franchise to undisclosed investors was a pretext for the termination is insufficient, standing alone, to bring into play the Act's protections. While we have previously recognized that condonation of breach of agreement in certain circumstances raises issues of fact precluding a grant of summary judgment, *Diehl & Sons, Inc. v. International Harvester Co.*, 445 F.Supp. 282, 288 (E.D.N.Y.1978), plaintiffs' failure to come forward with evidence to support the existence of a wrongful demand within the contemplation of the Act renders inquiry into the validity of the cause of termination unnecessary. *Id.* (wrongful demand for mutual termination of agreement). The Act does not protect against every wrongful termination or breach of contract, and plaintiffs must look to State law for relief in these circumstances.

Nor does plaintiffs' citation to *Marquis v. Chrysler Corp., supra*, lend support to their DDICA claim. There the court found in the facts and circumstances of that case a wrongful demand on plaintiff to relocate the dealership, followed closely by a termination notice after over seven years of condonation of plaintiff's breach of a minimum sales responsibility clause in the dealership agreement. The court stated:

"We think that Chrysler Motors breached the statutory duty of good faith. Rather than enforcing the MSR as written or adjusting it to excuse periods of sub-MSR sales, it permitted Marquis to continue in business with sales below MSR. Then, when it suited Chrysler Motors' purposes, it demanded compliance with MSR post facto and, pointing to the dealership history of sub-MSR sales, terminated the franchise.

"The jury considered the motivation, timing and manner of termination to be intimidating and coercive in light of all the facts and circumstances. Chrysler Motors' conduct in this case was precisely the kind of intimidating and overbearing

manufacturer conduct that the Act was designed to proscribe." 577 F.2d at 635.

In direct contrast, defendants here sought to do no more than end, within a short period of discovering grounds for plaintiffs' termination, a business relationship with Fallon they considered unsatisfactory. They exercised, moreover, their considered judgment and discretion in replacing Fallon with Fox rather than McDaniel or any other candidate for the point, presumably for intracorporate purposes. In the absence of evidence that the termination was designed to punish plaintiffs for their failure to do some act or for doing some act, defendants' conduct did not run afoul of the Act's proscriptions, even if they suffered plaintiffs' breach for some months before acting to terminate the agreement. Cf. York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., 447 F.2d 786 (5 Cir. 1971).

Simply put, defendants did not warn plaintiffs to sell their dealership property to Fox or risk termination, or for that matter make any demand on plaintiffs. While there can be little doubt that plaintiffs found themselves in a far from enviable position—no doubt on account of the very nature of the franchise relationship—this does not warrant invocation of the federal Act's protections. Whether or not defendants' conduct violated any duty arising under State law is another matter, to which we now turn.

### State Law Claims

Plaintiffs' State law claims allege violation of the New York Uniform Commercial Code § 2–302; New York General Business Law §§ 340, 197 and 197–a; breach of duty to perform contract in good faith; violations of vested rights as a third party beneficiary; breach of duty to make a final decision under the General Motors Dealer Relations Umpire Plan; violations of duties alleged to arise out of existence of a joint venture; breach of fiduciary duty; and tortious interference with contractual relations. Having granted summary judgment dismissing the complaint to the extent it seeks relief under federal law, we must now

determine whether it is appropriate to proceed with decision on the merits of the State law claims outlined above.

■ Although the court has the power under *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), to adjudicate plaintiffs' State law claims, pendent jurisdiction is a doctrine of discretion, not of plaintiffs' right. *Id.* at 726, 86 S.Ct. 1130. In exercising this discretion, see *Crane Co. v. American Standard, Inc.*, 603 F.2d 244, 253–54 (2 Cir. 1979), we are guided by the principles set forth by the Court in *Gibbs*:

> "Needless decisions of state law should be avoided as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." 383 U.S. at 726–27, 86 S.Ct. at 1139 (footnotes omitted).

■ Since the court is of opinion that federal law does not provide the basis for the relief sought and relief, if any, can only be obtained as a matter of State law and policy, we are persuaded that the better course is dismissal of the State law claims without prejudice to their assertion in an appropriate State forum. This will permit a State court to fashion relief under applicable principles of State law, if appropriate, providing the parties a "surer-footed" reading of the law. We hold to Judge Magruder's often-quoted concurring comment in *Strachman v. Palmer*, 177 F.2d 427, 433 (1 Cir. 1949), that "[f]ederal courts should not be overeager to hold onto the determination of issues that might be more appropriately left to settlement in state court litigation merely because they have 'jurisdiction' to do so by virtue of a complaint making an

unfounded claim of federal right." See *Hodge v. Mountain States Tel. & Tel. Co.,* 555 F.2d 254, 261 (9 Cir. 1977); *Wham-O-Mfg. Co. v. Paradise Manufacturing Co.,* 327 F.2d 748, 752–54 (9 Cir. 1964). See also *Kavit v. A. L. Stamm & Co.,* 491 F.2d 1176, 1179–80 (2 Cir. 1974).

Accordingly, defendants' motion for summary judgment dismissing the federal claims is granted. The complaint, insofar as it seeks relief under State law, is dismissed without prejudice to further litigation of any such cause of action in an appropriate State forum.

SO ORDERED.

The Clerk of the Court is directed to enter judgment dismissing the complaint. The Clerk is further directed to forward copies of this memorandum and order to counsel for the parties.