**James O. QUARLES, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION (MOTORS HOLDING DIVISION), Defendant.**

**No. CIV–84–629T.**

United States District Court, W.D. New York.

Oct. 31, 1984.

Geiger & Rothenberg, Rochester, N.Y. (Alexander Geiger, Rochester, N.Y., of counsel), for plaintiff.

Harter, Secrest & Emery, Rochester, N.Y. (Anthony R. Palermo, Rochester, N.Y., of counsel), for defendant.

TELESCA, District Judge.

On May 22, 1984, defendant, acting through its agents on the Board of Directors of Jim-Sandy Chevrolet, Inc., removed plaintiff from his position as President and Director of that corporation. On the basis of that termination, plaintiff commenced the instant action, alleging two causes of action against defendant. The first asserts a claim under 42 U.S.C. Section 1981, alleging a denial of freedom of contract on grounds of race. The second cause of action alleges that defendant failed to act in good faith in terminating plaintiff's franchise agreement, in violation of 15 U.S.C. Section 1222. Defendant now moves for an order of dismissal of the complaint, or in the alternative, for summary judgment, on the grounds, *inter alia*, that there is no genuine issue as to any material fact.

### FACTS

Although the affidavits submitted by the parties raise a host of factual disagreements, the following material facts are more or less undisputed. Jim-Sandy Chevrolet, Inc. ("Jim-Sandy") was organized in January, 1981. The corporation's shareholders included plaintiff, James Quarles, his partner, Sandor Byers, and defendant, General Motors Corporation, Motors Holding Division ("GMC"). Plaintiff was President of the Corporation, and Byers was Vice-President. GMC, as chief investor in Jim-Sandy,[1] owned all of the corporation's

---

1. Plaintiff's initial dollar investment to the capital and real estate purchase of Jim-Sandy was $50,000.00, while Byers invested $30,000.00. GMC invested $810,000.00 in Jim-Sandy stock and an additional $305,000.00 in a loan to the corporation for a total investment of $1,115,000.00.

voting stock and controlled three of the five members of the Board of Directors.

The advertising agent for Jim-Sandy Chevrolet was Bob Mills. As early as January of 1983, it began to appear that Jim-Sandy's advertising expenses were excessive. The problem came to the formal attention of all parties at least as early as September 16, 1983, at a special meeting of Jim-Sandy's Board of Directors attended by plaintiff, Byers, and John J.L. Johnson, II, defendant's Branch Manager in Buffalo, New York. The meeting was convened to review a special accounting report completed that same day by one of defendant's accounting supervisors. The minutes of the meeting report that:

> The advertising account was analyzed and found that there was a discrepancy between the billing to the Bill [sic] Mills Advertising Group and the invoices. It was agreed that the President and Vice-President would personally look into this matter and that they would furnish the Board all the supporting documentation by September 23, 1983.

The minutes of that meeting were signed by plaintiff, who also served as Chairman of the meeting.

On September 23, 1983, another meeting of the Board of Directors was chaired by plaintiff at the offices of Jim-Sandy Chevrolet. Mr. Johnson was informed that the promised documentation was not yet available, because Bob Mills was out of town. According to the minutes of the meeting,

> Mr. Johnson expressed his disappointment over this matter and stated that this is a very serious matter involving a large amount of money and that he wanted to have this cleared up. The President and Vice-President agreed to furnish all the necessary documentation by the first week in October of 1983.

Quarles and Byers never produced documentation to support the billings from the Bob Mills Advertising Agency.

In November, 1983, it was discovered that Jim-Sandy had been billed and had paid Forty-nine Thousand Eight Hundred Eighty-six Dollars, ($49,886) to Bob Mills for television advertising which was never actually purchased. By plaintiff's admission, it became clear that Bob Mills had submitted fraudulent advertising bills and forged invoices. In February, 1984, Johnson retained an attorney, Stephen Cavanaugh, to bring an action by Jim-Sandy against Bob Mills to recover the advertising overpayments and other damages suffered by the company as a result of the fraud.

The following month, Mills offered $49,886 to settle the lawsuit. Cavanaugh recommended to the Board of Directors that the offer be rejected so the company could determine whether employees of Jim-Sandy had participated in the fraud. At a March 23, 1984 Board of Directors meeting, Quarles and Byers voted, against the other three directors, to accept the offer of settlement, allegedly because litigation would take too long. Nevertheless, the resolution to reject the offer of settlement and pursue legal action was carried.

Cavanaugh served a notice to examine Mills before trial. He received a cross-notice from Mills' attorney requesting that Quarles and Byers be made available for deposition. Cavanaugh informed Quarles and Byers that they were required to give testimony on behalf of Jim-Sandy on May 3, 1984. Without offering any reason, Quarles failed to appear at the scheduled Examination before Trial. Both Byers and Mills appeared and testified at the scheduled Examination. Cavanaugh then informed Quarles that his deposition had been rescheduled to May 14, 1984, and urged him to testify on behalf of Jim-Sandy, since Mills' attorney had indicated that he would move to dismiss the action if Quarles again failed to appear. Without offering an explanation, plaintiff refused to attend the scheduled deposition.

At their depositions on May 3, 1984, Mills and Byers testified that Mills had agreed with Quarles and Byers to overbill Jim-Sandy for advertising services and to return the overpayment in cash to Quarles and Byers. Under this scheme, Jim-Sandy was allegedly overcharged $49,886 which

amount was divided equally between Quarles and Byers, and in return Mills received free use of a company car.

Quarles was afforded one final opportunity to explain his failure to cooperate in the lawsuit against Mills, or to deny the sworn accusations made against him by Mills and Byers. On May 16, 1984, Quarles received notice that a special meeting of the Board of Directors would be held at the offices of Jim-Sandy Chevrolet to review the status of the litigation, and to consider the resignation or removal of Byers and Quarles. Quarles refused to attend the meeting, allegedly on advice of counsel, once again without explanation.

At the May 22, 1984 meeting, the Board of Directors accepted the resignation of Byers, which had been tendered earlier that day, and voted unanimously to remove Quarles. According to sworn statements by two of the Directors participating at the meeting, plaintiff's removal was based upon his numerous actions and inaction in refusing to cooperate with Jim-Sandy in its lawsuit against Mills, upon his urgent desire to settle the lawsuit without uncovering the corporate employees involved in the fraud, and upon the sworn testimony of Mills and Byers that Quarles had actively participated in the fraud. Although plaintiff now alleges that he was innocent of any wrongdoing, he does not deny that his continued silence gave defendant and its officers no reason to doubt the suspicious circumstances pointing toward his guilt.

## DISCUSSION

### I.

■ Plaintiff contends that his removal was in violation of the so-called "Automobile Dealers' Day in Court Act" ("DDCA"), 15 U.S.C. Sections 1221, *et seq*, which permits a dealer to sue an automobile manufacturer in federal court for failing to act "in good faith" in cancelling the dealer's

franchise. Defendant argues that this cause of action should be dismissed because (1) Plaintiff does not possess standing under the Act; (2) no franchise has been terminated; and (3) there is no issue of material fact in regard to the "good faith" of defendant in removing Quarles as an officer and director of Jim-Sandy. Because I agree with the last of defendant's three arguments, I need not discuss the others.[2]

■ At the outset, it must be remembered that the DDCA did not create a federal remedy for breach of contract, but rather created an entirely new cause of action. *RAC Motors, Inc. v. World-Wide Volkswagen Corp.*, 314 F.Supp. 681 (D.C. N.J.1970). The Act was designed to supplement the anti-trust laws of the United States, and to help correct the imbalance of bargaining power between auto manufacturers and dealers. *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 910 and n. 6 (9th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 561 (2nd Cir.1970). As "Congress' initial effort at regulation of the relationships between automobile manufacturers and their dealers", the DDCA admittedly falls far short of providing a basis for relief in every case of unfair conduct, including many cases which "might well call for remedial action". *McDaniel v. General Motors Corp.*, 480 F.Supp. 666, 677 (E.D.N. Y.), *affd.* 628 F.2d 1345 (2nd Cir.1980).

■ It is well settled that an indispensable element of this statutory cause of action is a showing that defendant failed to act "in good faith", although not in the ordinary sense of that phrase. Section 1221(e) of the Act defines "good faith" to mean the duty of each party to an automobile franchise agreement:

to act in a fair and equitable manner toward each other so as to guarantee the

---

**2.** Although it is unnecessary for me to reach the question, I point out that defendant's first two arguments are without merit in the present case, for the reasons cogently stated by the Court of Appeals in *Vincel v. White Motor Corporation*, 521 F.2d 1113, at 1120 (2nd Cir.1975), *distinguishing and approving Kavanaugh v. Ford Motor Company*, 353 F.2d 710 (7th Cir.1965). *See also, Moorehead v. General Motors Corp.*, 442 F.Supp. 873 (E.D.Pa.1977).

one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

To demonstrate an absence of "good faith" within the meaning of the DDCA, therefore, it will not suffice to show that a dealership's termination was arbitrary, or even unfair. It must be shown that defendant coerced or intimidated plaintiff, and that the coercion was designed to achieve some objective which was improper or wrongful. *Howard v. Chrysler Corporation,* 705 F.2d 1285 (10th Cir.1983); *Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901 (9th Cir.), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683 (6th Cir. 1976); *Berry Brothers Buick, Inc. v. General Motors Corp.,* 257 F.Supp. 542 (E.D. Pa.1966), *affd.* 377 F.2d 552 (3rd Cir.1967). As one survey of the case law recently concluded:

> Failure to act in good faith sufficient to bring the [DDCA's] proscriptions into play is a limited concept, however, and is found only where there is evidence of a wrongful demand enforced by threats of coercion or intimidation. Without proof of lack of good faith within the meaning of the Act there can be no relief under the [DDCA], even for arbitrary decisions with respect to termination of a dealership.

*McDaniel v. General Motors Corp.,* 480 F.Supp. 666, 676 (E.D.N.Y.) (citations omitted); *affd.* 628 F.2d 1345 (2nd Cir.1980).

Accordingly, summary judgment would be compelled for the defendant in "the absence of any demand, express or otherwise, that plaintiffs do or refrain from doing some act at the risk of termination". *Id.,* at 677. Where there is no evidence of such wrongful coercion or intimidation by defendant, as those terms have been narrowly construed, there can be no recovery under the DDCA, "even if the manufactur-er otherwise acted in 'bad faith' as that term is normally used". *Fray Chevrolet, supra,* at 685; *Overseas Motors, Inc. v. Import Motors Limited,* 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

Turning to the facts of the present case, the question to be resolved is whether there is any evidence of a wrongful demand by GMC that Quarles do or refrain from doing some act at the risk of termination. Plaintiff asserts that he was terminated "in retaliation for my persistent efforts to attempt to call attention to improper practices, corruption, and fraud being committed by GM employees and by my partner, Sandy Byers" (Quarles Affidavit, para. 15). Given the facts which lie beyond dispute in this case, however, that conclusory speculation is without justification. There is simply no basis upon which any jury could draw such an inference, even if all of plaintiff's factual allegations were accepted as true.

In support of the theory that he was removed because of his efforts to expose the fraud committed by Byers and Mills, plaintiff's affidavit offers a detailed version of events occurring in the early part of 1983. Starting in January of 1983, plaintiff alleges that he began to make repeated demands to a number of superiors in GMC for an audit of the Jim-Sandy advertising account, but met only with indifference, recalcitrance, and even reprimands. Sometime in late 1983, plaintiff alleges that he finally discovered proof of Mills' wrongdoing with the assistance of Bill Behm, an accounting supervisor from GMC who had arrived at plaintiff's prodding. When plaintiff and Behm attempted to report this information to their supervisors in GMC, they were allegedly chastised by John Johnson for not following the proper channels.

If the story had ended there, there might have been at least some plausibility to plaintiff's theory that defendant tried to "cover up" any evidence of the fraudulent advertising overpayments, and to coerce plaintiff into silence. Yet plaintiff does not

allege a single explicit threat of retaliation or coercion, much less any overt act of coercion, by defendant at any time during the period when defendant allegedly reacted to his complaints with hostility.

Furthermore, plaintiff's proposed connection between the alleged coverup in early 1983 and his termination in May, 1984, is decisively refuted by defendant's action during the intervening eight months. Beginning in September, 1983, defendant's employees conducted an audit which uncovered discrepancies in the Jim-Sandy advertising account, called two special meetings of the corporation's Board of Directors to openly address this "very serious matter", repeatedly pressed Quarles and Byers to clear the matter up, brought a lawsuit against the advertising agency, refused to accept a full settlement offer because it would have let some guilty parties escape detection, and scheduled three depositions at which Quarles would have had the opportunity to state on the record everything he knew or suspected about the fraud. Only after eight months of such activity did defendant fire Quarles. These were hardly the actions of a corporation attempting to silence Quarles and cover up the Bob Mills fraud as claimed by the plaintiff.

█ Viewing all of the facts in the light most favorable to plaintiff, therefore, there is absolutely no evidence that plaintiff was punished in retaliation for "blowing the whistle" on Byers and Mills. In the complete absence of any evidence that defendant attempted to coerce him to comply with a wrongful demand, plaintiff's claim under the Dealer Act must be dismissed, even if his removal were unfair or undeserved for some other reason.[3] As the courts have often observed in similar situations, "the Act does not protect against every wrongful termination or breach of contract, and

plaintiffs must look to State law for relief in these circumstances". *McDaniel, supra,* at 677.

The plaintiff has failed to provide any evidence that defendant failed to act in "good faith" in arranging his termination, particularly as that term is defined in the context of the DDCA. Consequently, although plaintiff's lengthy and detailed affidavit raises a great number of unanswered questions of fact, this case poses "no genuine issue as to any *material* fact", Fed.R.Civ.P. 56(c), and defendant is entitled to a judgment as a matter of law.

## II.

Plaintiff's remaining cause of action asserts a claim under 42 U.S.C. Section 1981, alleging that defendant denied him freedom of contract on grounds of his race. Plaintiff contends that one of the reasons for his termination was racial prejudice against him, because he is black.

█ Liability under Section 1981 requires proof of intentional discrimination. *General Building Contractors Ass'n. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Plaintiff has not alleged any facts which would support his assertion that defendant relied on the Bob Mills affair as an "excuse" to conceal any discriminatory intent. In fact, all of the evidence points to a contrary conclusion. Plaintiff's unsubstantiated speculation that defendant might be guilty of a nationwide pattern of racial discrimination is more than adequately rebutted by the detailed and uncontradicted affidavit of John Burke, defendant's Manager of Branch Operations. Among other points, that affidavit establishes that the percent of GMC dealers with black operators, as well as the percent of defendant's investment in black operated dealerships, has

---

**3.** In reaching this decision, it is not necessary to decide whether defendant's proffered explanation for removing plaintiff was sincere. Even the possibility that the alleged justification "was a pretext for the termination is insufficient, standing alone, to bring into play the Act's protections". *McDaniel, supra,* 480 F.Supp. at 677. In this case, as in *McDaniel,* "plaintiff's failure to come forward with evidence to support the existence of a wrongful demand within the contemplation of the Act renders inquiry into the validity of the cause of termination unnecessary". *Id.* Such inquiry is necessary, however, with respect to plaintiff's cause of action under 42 U.S.C. Section 1981.

 

steadily increased in recent years. Moreover, plaintiff's allegations of racial animosity in his own case sound strangely hollow in light of the fact that defendant paid him a regular stipend while training him for 21 months at the General Motors Dealer Development Academy.

Once a defendant has articulated a legitimate, non-discriminatory reason for an employee's removal, (as defendant certainly has in this case), plaintiff has the burden of proving "that the presumptively valid reasons for his rejection were in fact a cover-up for a racially discriminatory decision". *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 1826, 36 L.Ed.2d 668 (1973). Plaintiff must prove that defendant's explanation for the decision "was a pretext or discriminatory in its application". *Id.* 411 U.S. at 807, 93 S.Ct. at 1827.[4] In the present case, plaintiff has failed to allege any facts which would support such an inference. As the Supreme Court observed in describing this burden, "especially relevant to such a showing would be evidence that white employees involved in acts against [defendant] of comparable seriousness … were nevertheless retained or rehired". *Id.* 411 U.S. at 804, 93 S.Ct. at 1825. No such evidence is present in this case. On the contrary, plaintiff's business partner, a white man, was forced out of the dealership on the same day, by the same employees of the defendant, for the same reason.[5] Rarely does one encounter in nature such remarkably well controlled "laboratory conditions" for insuring that the reasons for one employee's termination are "applied alike to members of all races". *Id.*

Since plaintiff has been unable to allege any specific facts which, if proved, would suggest that the reasons given for his removal (and for that of his white partner) were merely a pretext employed by defendant to conceal its racial prejudice, the claim under Section 1981 must also be dismissed.

## CONCLUSION

For the foregoing reasons, plaintiff's allegations fail to raise any genuine question of material fact, and the defendant is entitled to summary judgment, dismissing both claims.

ALL OF THE ABOVE IS SO ORDERED.

---

**4.** Although *McDonnell Douglas* dealt with Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, *et seq.*, the same standards governing allocation of burdens of proof are applicable to a Section 1981 action. *Hudson v. I.B.M. Corp.*, 620 F.2d 351, 354 (2nd Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

**5.** Technically, of course, there was one difference between the two cases. Defendant was able to accept the resignation submitted by Byers, but was required to take the affirmative step of removing Quarles without his consent. As plaintiff has implicitly conceded (Quarles Affidavit, paras. 50, 57–58), however, Byers understood that his "voluntary" resignation was the only alternative to forceable removal.